Ali M. AFKHAMI, Anahita Afkhami, Farbod Afkhami, Fatemeh Z. Afkhami, Mehran Afkhami, and Shabnaz Taherkhani, Plaintiffs,

v.

CARNIVAL CORPORATION, d/b/a Carnival Cruise Lines, Defendant.

No. 02–21957–CIV.

United States District Court, S.D. Florida. Miami Division.

Jan. 28, 2004.

---

Jeffrey Daniel Rubinstein, Rubinstein & Associates, Miami, FL, Anthony A. Fatemi, Bethesda, MD, for Ali M. Afkhami, Anahita Afkhami, Farbod Afkhami, Fatemeh Z. Afkhami, Mehran Afkhami, Shabnaz Taherkhani, plaintiffs.

James Scott Bramnick, Carmen Sirkin Johnson, Akerman Senterfitt & Eidson, Miami, FL, for Carnival Corporation dba Carnival Cruise Lines, defendant.

## *ORDER ON PENDING MOTIONS*

ALTONAGA, District Judge.

**THIS CAUSE** came before the Court upon Defendant, Carnival Corporation, d/b/a Carnival Cruise Lines' Partial Motion to Dismiss and Partial Motion to Strike Plaintiffs' Second Amended Complaint (D.E. 38); Defendant's Motion for Summary Judgment (D.E. 76); and Plaintiffs' Motion for Continuance of Trial (D.E. 100). The Court has reviewed the motions, the response and reply memoranda, the pertinent portions of the record, and applicable law.

## I. *PROCEDURAL BACKGROUND*

In their Second Amended Complaint, Plaintiffs, Ali M. Afkhami ("Ali"), Anahita Afkhami ("Anahita"), Farbod Afkhami ("Farbod"), Fatemeh Z. Afkhami ("Fatemeh"), Mehran Afkhami ("Mehran") and Shabnaz Taherkhani ("Shabnaz") (collectively "Plaintiffs"), seek redress pursuant to 42 U.S.C. § 1981 (§ 1981) (Count I); 42 U.S.C. § 1983 (§ 1983) (Count II); and Title II of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000a *et seq.* ("Title II") (Count III). Count I alleges that Defendant, Carnival Corporation, d/b/a Carnival Cruise Lines (hereinafter "Carnival"), "violated Plaintiffs' right to make and enforce contracts" as well as "Plaintiffs' rights found in the Constitution or other federal laws," and that Carnival violated these rights "while acting under color of state law . . . . because Carnival uses the Port of Miami, pursuant to contractual agreements between the Defendant and the Port of Miami." (Second Amended Complaint, ¶¶ 18–19). Count II alleges only that Plaintiffs sue Carnival under § 1983 "because Defendant violated Plaintiffs' civil rights," without more. (*Id.* ¶ 24). Count III alleges that Carnival violated Title II because "Plaintiffs were denied access to a place of public accommodation, to wit: Defendant's cruise ships, on the basis of racially discriminatory acts by Defendant." (*Id.* ¶ 30). Plaintiffs seek compensatory damages for emotional distress, mental pain and suffering, mental anguish, and psychological injury, as well as punitive damages under Counts I, II and III.

On November 25, 2002, Carnival filed a Partial Answer and Affirmative Defenses, and a Partial Motion to Dismiss and Partial Motion to Strike the Second Amended Complaint (D.E. 37 & 38). On December 31, 2002, the Court granted Carnival's Partial Motion to Dismiss and Partial Motion to Strike by default based on Plaintiffs' failure to respond to the motion within the time required by the Rules (D.E. 47). On January 9, 2003, Plaintiffs' request for reconsideration of, and to set aside, the December 31, 2002 Order (D.E. 48), was granted. The December 31, 2002 Order was vacated on May 13, 2003 (D.E. 68),

thus reinstating Carnival's Partial Motion to Dismiss and Partial Motion to Strike the Second Amended Complaint (D.E. 38), which is now ripe for consideration.

On July 31, 2003, Carnival filed a Motion for Summary Judgment (D.E. 76), and in support, a Statement of Undisputed Material Facts, transcripts of the depositions of the six Plaintiffs, and the declarations of Carnival employees, Pedro Arce, Clarissa Martinez, Robert Beh, Brendan Corrigan, and Christian Gonzalez. In response, Plaintiffs filed a Statement of Disputed Material Facts that identified only the following two issues of fact as "disputed":

1. Contrary to the contentions contained in paragraph 16 of Defendant's Statement of Undisputed Material Facts, no one from Defendant told Plaintiffs they could never sail on Defendant's ships again. . . .

2. Further, paragraph 16 of Defendant's Statement of Undisputed Material Fact [sic], contradicts paragraph 29, as no where else is there a contention that in addition to Ms. Martinez, Christial [sic] Gonzalez also told Plaintiffs on January 6, 2002 that they could never cruise with Defendant ever again.

Plaintiffs also filed the Affidavit of Anahita in response to the Motion for Summary Judgment.

On January 26, 2004, Plaintiffs filed a Motion for Continuance of Trial premised on the pendency of these potentially dispositive motions, to which Defendant agrees.

## II. *FACTUAL BACKGROUND* [1]

Carnival operates cruise ships in the Caribbean, Gulf of Mexico, and Pacific Ocean. Plaintiffs had sailed on Carnival cruises on two occasions and had positive experiences. Indeed, they had such positive experiences on Carnival cruises that "because of that we actually wanted to go a third time." (Deposition of Ali M. Afkhami, 8:1–2). Farbod and his wife, Shabnaz, planned a third cruise as part of their honeymoon.

Farbod's family planned to join them on the cruise as part of a family vacation. These family members included Farbod's father, Ali; mother, Fatemeh; brother, Mehran; and sister, Anahita. All of them, with the exception of Shabnaz, are United States citizens and residents of Maryland, and were traveling with United States passports. All are of Iranian national origin and Persian descent, facts that are noted in their passports.

On November 16, 2001, Farbod purchased tickets for his family members through Expedia.com for a January 6, 2002 Carnival cruise on the ship, *Victory*. The Afkhami family traveled by car from their home in Maryland to Miami for the Carnival cruise. Plaintiffs received their tickets approximately one-to-two weeks prior to their January 6 cruise.

Carnival's ticket contract states at paragraph 4(e): "No Guest is permitted to bring on board the Vessel live animals (other than qualified service animals, with not less than 14 days advance notice given to Carnival)." Paragraph 6 reads:

6. (a) The Guest warrants that he and those traveling with him are physically fit to travel at the time of embarkation and is required to notify Carnival in writing at the time of booking the cruise of any physical disability or medical condition which may require special assistance during the voyage. Failure to do

---

**1.** The facts are taken from the parties' Statements of Material Facts filed in conjunction with summary judgment and the documenta-ry and testimonial evidence in the record, and are undisputed unless otherwise noted.

so will release Carnival from any liability for loss, damages, or other compensation arising from or related in any way to such disability or condition. Upon booking the cruise, guests who have special needs are required to contact Carnival's Special Needs Desk (305) 599–2600 (ext. 70025) to discuss the details of their special needs. Carnival reserves the right to require that any Guest, who is not self-sufficient, travel with a companion who shall take responsibility for any assistance needed during the voyage and in case of emergency.

(b) Carnival and the Master each reserves the right to refuse passage, disembark or confine to a stateroom any Guest whose physical or mental condition, or behavior would be considered in the sole opinion of the Captain and/or the ship's physician to constitute a risk to the Guest's own well-being or that of any other Guest or crew member.... Carnival and the Master reserve the right to disembark any guest whose behavior affects the comfort, enjoyment, safety or well being [sic] of other guests or of any crew.

By signing their boarding passes, Plaintiffs indicated that they received, read and agreed to the terms and conditions of the ticket contracts.

On January 6, 2002, Plaintiffs had tickets in their immediate possession for boarding purposes, had all other pertinent documentation, and arrived at the appropriate boarding time. After showing passports that noted their national origin, Plaintiffs cleared security with their baggage, and boarded the *Victory*, owned and operated by Carnival, then lying by Carnival's dock in Miami, Florida. The time of departure of the ship was advertised as 4:00 p.m. on January 6, 2002.

Notwithstanding the terms and conditions of their tickets, Plaintiffs boarded the *Victory* with a small wooden container of fifty to sixty live bees. Plaintiffs did not seek permission from Carnival prior to carrying the bees aboard the *Victory* nor die they advise Carnival that the bees were in their possession when they passed through security, or upon boarding. The container of bees was not discovered until after the Plaintiffs had boarded the *Victory*. The container was found in one of the three cabins booked by the Afkhamis. A warning on the container of bees cautioned, "[a]llergic reactions to honey bee stings can cause **death**. Use at your own risk." Plaintiffs had not read the terms and conditions of their ticket contracts prior to boarding the *Victory* on January 6, 2002, and therefore, they did not know that bringing the bees would violate their ticket contracts with Carnival.

Once on board the *Victory*, Plaintiffs broke up into separate groups. Approximately one hour after they boarded, Plaintiffs were called *via* the intercom system to the Plaintiffs' guest room where the bees had been discovered. Carnival's security staff responded as well as the Ship's agent on duty that day, Christian Gonzalez. Representatives of several federal agencies, including U.S. Customs ("Customs") and the Immigration and Naturalization Service ("INS"), were already on the ship investigating an unrelated incident. They also responded to the scene. Customs checked the Plaintiffs' luggage and INS checked their passports.

It is part of the Ship Agent's job to deal with any passenger problems and make sure the vessel sails as scheduled. The *Victory* was being significantly delayed in its departure because of the investigation involving the Afkhamis and the unrelated incident. Accordingly, Mr. Gonzalez telephonically reported the incident to Brendan Corrigan, Vice President of Cruise Operations.

Carnival employees searched Plaintiffs' cabins and questioned Plaintiffs regarding the presence of the small wooden container of live bees. Plaintiffs explained that bee venom medication was used exclusively by two family members, Farbod and Anahita, as medical treatment for multiple sclerosis. Farbod and Anahita apparently utilized the venom from the bee stings as a non-prescribed medical treatment for symptoms associated with multiple sclerosis. The ship's doctor was asked for his opinion. He stated that the bees were a danger to other passengers because bee stings may have life-threatening consequences for those who are allergic to bee venom.

Plaintiffs allege that during the investigation, they overheard a Carnival employee, probably Christian Gonzalez, while talking on a cellular phone, state, "they're Iranian, but they're nice people." Shabnaz has testified that the Carnival employee that made this statement was trying to convince others to let Plaintiffs stay on the ship. Indeed, he was pleading with the other person on the phone to let Plaintiffs continue on the cruise. Farbod has also testified that the person making the statement indicated that he was waiting for his orders from headquarters, but that if it were up to him, Plaintiffs would be able to remain on the ship. The statement was the only comment the Afkhamis heard regarding their national origin and the only fact, other than their passports being checked, that lead them to believe Carnival's actions were based on Plaintiffs' national origin.

Mr. Corrigan decided to disembark the Afkhamis after several telephonic discussions with Mr. Gonzalez, Mark Mann, from Carnival's Security Department, and Clarissa Martinez, then an Assistant Manager of Embarkation. Mr. Corrigan has testified that he made the decision because "[t]he Afkhamis violated terms of their ticket contract by bringing live animals aboard a ship. In doing so, I felt they had endangered the other passengers and needlessly delayed the ship's departure." (Corrigan Decl., ¶ 10).

Carnival employees informed Plaintiffs that they had violated Carnival's rules and regulations by bringing live bees onto the *Victory,* and told Plaintiffs they had to leave the ship. Plaintiffs offered to get rid of the bees, or have Carnival get rid of the bees, and proceed on the cruise without them. Plaintiffs' request was rejected. They were required by Carnival to leave the *Victory* and the bees were confiscated by Customs and the U.S. Department of Agriculture.

Plaintiffs left the *Victory* assisted by Ms. Martinez. Plaintiffs' baggage was contemporaneously carried out of the ship by Carnival employees. While they were leaving the ship, Ms. Martinez has testified that one of the Plaintiffs asked her if they could board another Carnival ship on the next day. Ms. Martinez called Mr. Corrigan to ask him the Plaintiffs' question. Mr. Corrigan thought this was an unusual request and asked Ms. Martinez to tell the Plaintiffs they could not return on a Carnival vessel. Ms. Martinez has testified that she passed this information on to the Plaintiffs, who were standing around her in a group. Carnival's ships were under a state of heightened security at the time of this incident, which occurred only four months after the events of September 11, 2001. Mr. Gonzalez also became aware that Brendan Corrigan had decided that the Afkhamis would be prohibited from sailing on another Carnival cruise and overheard Ms. Martinez give the family that information.

Farbod denies being told that he could not sail on another Carnival ship. Anahita similarly alleges that she was unaware that she was not allowed to sail on another

cruise with Carnival. Ali, who does not speak English, testified that he was not told of Carnival's instruction. Fatemeh also does not speak English and does not recall Carnival's instruction that they not book another cruise with Carnival for the next day. Shabnaz acknowledges that at the time of this incident, she only understood 50% of what was being spoken in English. Shabnaz does not recall being told that they could not immediately book another Carnival Cruise after January 6, 2002. Mehran has no recollection of this entire incident.

Carnival does not have a computer system that would allow it to "flag" a particular passenger who has been told not to return. Instead, Carnival relies on communications with its various facilities. Ms. Martinez was out sick on January 7, 2002, so she sent an e-mail to one of the staff persons in her office asking her to notify all of Carnival's home ports that the Afkhamis were not allowed to sail on any Carnival ship. Unfortunately, Ms. Martinez did not realize until later that day that the staff person had not read her e-mail and the notification to all the home ports did not go out as expected.

On January 6, 2002, after disembarking from the *Victory*, Plaintiffs stayed at a hotel in Miami for the night. From the hotel, Farbod called Carnival and other cruise lines searching for a cruise that would sail the following day. Farbod claims that the only cruise available on the desired date was a cruise on Carnival's *Imagination*. Plaintiffs decide to re-book a Carnival cruise after their experience the prior day for several reasons: (1) Carnival offered the "cheapest" cruises; (2) Plaintiffs thought the only reason they had been removed from the *Victory* on January 6, 2002 was their possession of bees, and they did not intend to carry bees on January 7, 2002; and (3) they had enjoyed their two

previous cruises on Carnival ships. Moreover, Plaintiffs were intent on taking a cruise because they were away from home and they wanted a vacation. Therefore, Farbod purchased six tickets for a cruise on Carnival's *Imagination*, which was scheduled to depart from Miami on January 7, 2002. When Farbod purchased the cruise tickets over the telephone, he did not advise the Carnival reservations agent that he and his family had been removed from a Carnival ship on that same day due to a violation of the terms and conditions of their ticket agreements.

On January 7, 2002, Plaintiffs picked up their tickets from Carnival at the Port of Miami terminal. Once again, Plaintiffs presented their passports for inspection, cleared security checkpoints with their baggage, boarded the *Imagination*, this time without any bees, and were assigned cabins.

When Ms. Martinez realized her notification regarding the Afkhamis had not been sent out, she called Pedro Arce, the Supervisor of Embarkation on duty at the Port of Miami on January 7, 2002. Mr. Arce advised Ms. Martinez that the Afkhamis had already boarded the ship. She told Mr. Arce that they were not allowed to sail with Carnival per Brendan Corrigan's instructions the day before. Mr. Arce then notified Mr. Gonzalez, who was again assigned as the Ship's agent on January 7, 2002, and asked him to disembark the Afkhamis.

Mr. Gonzalez went to the Afkhamis' cabins accompanied by the ship's Chief Security Officer to advise them that they needed to disembark in accordance with Brendan Corrigan's instructions. When Mr. Gonzalez and the Chief Security Officer arrived at the Plaintiffs' cabin, Plaintiffs were not there. They were paged through the *Imagination's* intercom system and asked to return to their cabins.

Anahita and Shabnaz were together when they heard the page and responded to the lobby. There they were asked to wait for a few minutes. While they were waiting, they saw some unidentified Carnival employees bring up a couple of their pieces of luggage along with a gas canister. Shabnaz testified that she saw an unidentified male Carnival employee place one of Plaintiffs' name tags around the gas canister. They later followed two unknown Carnival employees towards their cabins while they pushed the luggage cart containing Plaintiffs' luggage and the canister. Anahita indicates that she recalls saying something to the persons pushing the luggage cart about the canister not belonging to the Plaintiffs. Shabnaz does not indicate that she or Anahita advised the Carnival employees pushing the cart that the canister did not belong to the family.

One of the cabins (the one in which Anahita and Shabnaz were staying) was a distance away from the other two cabins booked by the Afkhamis. The Carnival employees pushing the luggage cart continued to the other two cabins while Anahita and Shabnaz went to theirs. When they arrived at their cabin and saw no one waiting, they decided to go to the other two cabins where they found Mr. Gonzalez.

In the meantime, when Farbod and the other Plaintiffs arrived at their cabins, they observed that their luggage was in front of their cabins. The luggage of other passengers was also in the hallway. At some point, they noticed that the canister of compressed gas was alongside the Afkhamis' luggage. The canister had a luggage tag indicating that it belonged to the Afkhami family. For the most part, Farbod and Anahita were the ones talking with the Carnival employees. Farbod has testified that no one at Carnival asked Plaintiffs any questions about the gas canister.

Plaintiffs met with Christian Gonzalez. Mr. Gonzalez asked Plaintiffs, "I told you guys not to come back to this ship anymore. Why are you here again?" Mr. Gonzalez instructed Plaintiffs to leave the *Imagination.* Other than this statement, Farbod claims that Carnival did not tell Plaintiffs why they were removed on January 7, 2002. Shabnaz conceded that at the time of this statement, no one disputed Mr. Gonzalez's assertion that Plaintiffs had been told not to book another cruise with Carnival. Plaintiffs did not hear any reference made to their national origin on January 7.

The Afkhamis were disembarked from the *Imagination* along with their luggage and the gas canister. As they had done on January 6, 2002, Carnival employees carried Plaintiffs' belongings to the terminal. The Afkhamis left the canister behind after leaving the Port of Miami. The gas canister was eventually determined to belong to Carnival for use in pressurizing draft beer dispensers. It was also discovered that there were two other gas canisters that were mistakenly associated with the Plaintiffs. Carnival's security department investigated how the canisters became mixed up with Plaintiffs' luggage but was unable to determine how it happened. It is known that such canisters are loaded onto the same area of the ship as is passenger luggage.

Plaintiffs do not know of any non-Iranians who were permitted to sail on a Carnival Cruise ship with live bees, or any live animals. Plaintiffs are also not aware of any non-Iranian passengers who have been allowed to return on a Carnival ship after attempting to sail with live bees on a prior cruise, or after having been removed from a Carnival ship, for any reason, on a prior occasion.

Carnival routinely disembarks passengers or denies them access to its vessels

for multiple reasons, which include bringing cigarettes or smoking aboard a non-smoking ship, bringing contraband aboard, failing to present proper identification, violating minimum age requirements, and disorderly conduct. Between January 6, 2002 and February 3, 2002, at least forty-nine passengers were asked to disembark the *Victory*. Only the Afkhamis are known to have been of Iranian national origin.

Carnival also bars some passengers from sailing again. These decisions are made on a case-by-case basis and are communicated, usually verbally, to the passengers. Carnival does not maintain a list of passengers who have been barred from future travel. Carnival does have some anecdotal information regarding such passengers. For example, on December 10, 2002, Carnival advised Greg Platkin in writing of Carnival's decision to cancel his booking for a Carnival cruise as a result of several incidents of unacceptable conduct occurring on a previous Carnival cruise in 2001 and necessitating the involvement of the captain, purser staff, hotel staff, and security personnel. In its letter to Greg Platkin, Carnival stated that "[i]n order to avoid a repeat of any similar incidents, Carnival has determined it is best that you be denied boarding now and a full refund will be issued to you." (Declaration of Robert Beh, Exh. A). To the best of Carnival's knowledge, Mr. Platkin is not of Iranian national origin.

In 1995, a group of nine guests was involved in numerous incidents of disruptive behavior aboard Carnival's *Jubilee*. Upon reaching the terminal in Los Angeles, Carnival turned the guests over to Customs. One of these guests, Steve Won, managed to later board another Carnival ship, the *Elation*, in 1999. After repeated noise complaints, Chief Security Officer Raymond D'Monty asked Mr. Won and his roommate, Michael Mamanos, to

disembark. He specifically told them not to return. Despite this, both passengers tried to re-board. This time they were stopped by security personnel on the ship's gangway and turned over to immigration officers who escorted them to the airport for their flight home. To the best of Carnival's knowledge, these passengers were not of Iranian national origin.

## III. *LEGAL DISCUSSION*

### A. *Defendant's Motion for Summary Judgment*

Under Rule 56(c), Fed.R.Civ.P., a motion for summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Supreme Court explained the movant's burden in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) as follows:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Id.* at 322, 106 S.Ct. 2548. The Court further stated that "Rule 56(c) therefore requires a non-moving party to go beyond the pleadings and by [its] own affidavits or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548.

By its very terms, this standard provides that the mere existence of *"some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there will be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An issue is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Allen v. Tyson Foods,* 121 F.3d 642, 646 (11th Cir. 1997). An issue is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Allen,* 121 F.3d at 646. On a motion for summary judgment, the court must view all the evidence and all factual inferences drawn therefrom in the light most favorable to the non-moving party, and determine whether that evidence could reasonably sustain a jury verdict. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Allen,* 121 F.3d at 646.

While the burden on the movant is great, the non-moving party has a duty to present affirmative evidence in order to defeat a properly supported motion for summary judgment. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. A mere "scintilla" of evidence in favor of the non-moving party, or evidence that is "merely colorable" or "not significantly probative," is not enough. *Id.; see also Mayfield v. Patterson Pump Co.,* 101 F.3d 1371, 1376 (11th Cir.1996) (conclusory allegations and conjecture cannot be the basis for denying summary judgment). Moreover, otherwise admissible evidence may be submitted in inadmissible form at the summary judg-

ment stage, although inadmissible hearsay may not be used to defeat summary judgment when hearsay will not be available in an admissible form at trial. *See McMillian v. Johnson,* 88 F.3d 1573, 1584–85 (11th Cir.1996); *Gaston v. Home Depot USA, Inc.,* 129 F.Supp.2d 1355, 1361 (S.D.Fla. 2001). Thus, when an affidavit or deposition submitted in support of, or in opposition to, a motion for summary judgment contains inadmissible evidence, the court may strike the inadmissible portions of the affidavit or deposition and consider the rest. *Gaston,* 129 F.Supp.2d at 1361.

### 1. Certain Portions of the Affidavit of Anahita Afkhami are Disregarded

In its Reply in support of its Motion for Summary Judgment, Carnival moves the Court to strike the Affidavit of Anahita Afkhami. Carnival argues that, aside from merely recounting various undisputed facts presently in the record in this action, the Affidavit is replete with inadmissible evidence, legal conclusions and argumentative factual allegations that cannot be founded upon the affiant's personal knowledge. As such, the Affidavit, or at least portions of it, should be stricken from the record.

One of the deficiencies identified by Carnival is that despite the fact that there are a total of six plaintiffs in this case, the Afkhami Affidavit relies on the sworn testimony of only one of those six plaintiffs. Therefore, according to Carnival, Plaintiffs' reliance on the testimony of only one of six plaintiffs for the proposition that "[n]o agent of Defendant ... ever told Plaintiffs they could never book passage on any other Carnival cruise ship ever again," is misplaced because the testimony of all six plaintiffs in that regard would be required to establish this as a fact. (Affidavit of Anahita Afkhami ("Afkhami Aff.,

¶ 4")).[2] The argument is unavailing since Ms. Afkhami may certainly testify as to what she was told or not told by Carnival employees, as such statements would be admissions by a party. Fed.R.Evid. 801(d)(2). Accordingly, paragraph 4 of the Afkhami Affidavit will not be stricken.

Carnival also challenges paragraphs 10 through 13 of the Afkhami Affidavit. Paragraph 10 reads, in is entirety:

> The gas canisters were placed with Plaintiff's luggage, by agents of Defendant ... with Plaintiff's luggage tags attached thereto, as a pretext to enable Defendant, Carnival Corporation, to claim Plaintiffs were a security risk, and to force them to disembark from the *Imagination* under false pretenses, based on their Iranian national origin. After being asked to leave the second time, Plaintiffs [sic] felt unwelcome in the United States for the first time since she came here as a child. Plaintiff continues to feel unwelcome after the incident that occurred on January 7, 2002.

(Afkhami Aff., ¶ 10) (emphasis in original). The Court agrees that the language "as a pretext to enable Defendant, Carnival Corporation, to claim Plaintiffs were a security risk, and force them to disembark from the Imagination under false pretenses, based on their Iranian national origin," constitutes legal argument rather than a statement of fact, and therefore, this language is disregarded. The remaining language contained in paragraph 10 appears to be based on Ms. Afkhami's personal knowledge and is considered.

Paragraphs 11 through 13 read as follows:

> 11. There was no legal justification for the Plaintiffs to be forced to disembark from the *Imagination but for* their Ira-

nian national origin, and the pretext of having the gas canisters placed within the Plaintiff's luggage by agents of Defendant . . . .

> 12. Plaintiff cannot understand how any reason other than discrimination based on their Iranian national origin could have precipitated their being asked to leave the second time. If the first time was truly because of an innocent misunderstanding regarding bringing the live bees on board, there was no legal justification to preclude them from sailing without incident, without the bees, on another ship the next day.

> 13. Taking into consideration the second time the Plaintiffs were asked to leave, without any misconduct on the Plaintiff's part, based on what was said to them the day before, with the suspicious gas canisters placed by agents of Defendant within Plaintiff's luggage (which the Defendant has not explained), combined with fact that on the first day an agent of Defendant, Carnival Corporation, made reference to their family as Iranian, there is no other explanation as to why Plaintiff's [sic] were required to disembark the second time except that Plaintiffs were discriminated against based on their Iranian national origin.

(Afkhami Aff., ¶¶ 11–13) (emphasis in original). Here, too, Ms. Afkhami offers statements that may not be considered as evidence because they amount to nothing more than legal conclusions. Accordingly, paragraphs 11 and 12 of the Affidavit are disregarded in their entirety, and the following statement from paragraph 13 is also disregarded: "there is no other explanation as to why Plaintiff's [sic] were required to disembark the second time except that Plaintiffs were discriminated against based on their Iranian national

---

2. There are two paragraphs numbered 4 in the Afkhami Affidavit. The quote is taken from the second paragraph numbered as paragraph 4.

origin." The undersigned has only considered those portions of the Afkhami Affidavit, paragraphs 1 through 9, that are admissible as statements based on personal knowledge of the affiant. *See, e.g., Gaston,* 129 F.Supp.2d at 1361 (court may disregard inadmissible portions of affidavit submitted in connection with summary judgment and consider the rest).

### 2. The Undisputed Material Facts Do Not Make Out a *Prima Facie* Case of Discrimination Under § 1981 or Title II (Counts I and III)

■ Plaintiffs claim disparate treatment under § 1981 and Title II. Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981. Title II provides that "[a]ll persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a(a). In order to prove a *prima facie* case of "disparate treatment" discrimination, a plaintiff may prove his or her case through (1) direct evidence of discrimination, (2) pattern and practice evidence of discrimination, or (3) circumstantial evidence of discrimination. *See Aurel v. Sch. Bd. of Miami–Dade County Pub. Sch.,* 261 F.Supp.2d 1375, 1377 (S.D.Fla. 2003) (setting forth the three methods of proving disparate treatment discrimination

in the context of 42 U.S.C. § 2000e, *et seq.* ("Title VII")) (citation omitted).

■ Direct evidence of discrimination is "evidence which, if believed, would prove the existence of a fact [in issue] without inference or presumption." *Carter v. City of Miami,* 870 F.2d 578, 581–82 (11th Cir. 1989). It is also " 'composed of only the most blatant remarks, where intent could be nothing other than to discriminate' on the basis of some impermissible factor." *Schoenfeld v. Babbitt,* 168 F.3d 1257, 1266 (11th Cir.1999) (quoting *Carter,* 870 F.2d at 582). Viewing the facts in the light most favorable to Plaintiffs, there is no "direct" evidence of discrimination in the record. The one statement Plaintiffs refer to is made by a Carnival employee, probably Christian Gonzalez, that "they [Plaintiffs] are Iranian, but they're nice." This is the only comment allegedly made by Carnival regarding Plaintiffs' ethnicity. In order for a racially or ethnically derogatory statement to be direct evidence in a discrimination case, it must be (1) made by the decision-maker responsible for the alleged discriminatory act; and (2) made in the context of the challenged decision; otherwise, the statement is considered a "stray remark" and does not constitute direct evidence of discrimination. *See, e.g., Vickers v. Federal Express Corp.,* 132 F.Supp.2d 1371, 1378 (S.D.Fla.2000) (citing *Wheatley v. Baptist Hosp. of Miami, Inc.,* 16 F.Supp.2d 1356, 1359–60 (S.D.Fla.1998)) (Title VII and § 1981 case). Here, Christian Gonzalez was not a decision-maker, and thus, the first prong is not satisfied. There are no other statements or comments, or any other kind of direct evidence, which if believed, would prove the existence of national origin discrimination without inference or presumption.

■ Under the pattern and practice theory of discrimination, a plaintiff must provide evidence sufficient to establish

that impermissible discrimination was the defendant's standard operating procedure through a combination of historical, anecdotal, or statistical evidence. *See, e.g., Cooper v. Southern Co.,* 260 F.Supp.2d 1317 (N.D.Ga.2003); *Rhodes v. Cracker Barrel Old Country Store, Inc.,* 213 F.R.D. 619 (N.D.Ga.2003); *Ahmad v. Nassau Health Care Corp.,* 234 F.Supp.2d 185 (E.D.N.Y.2002). In other words, the plaintiff must present evidence of a pattern and practice of differential treatment affecting **other members** of his or her protected class. *See, e.g., Janey v. N. Hess Sons, Inc.,* 268 F.Supp.2d 616 (D.Md.2003); *McReynolds v. Sodexho Marriott Services, Inc.,* 208 F.R.D. 428 (D.D.C.2002) (noting that pattern and practice discrimination affects an entire class of individuals, while other disparate treatment claims involve an isolated incident of discrimination against a single plaintiff); *Bliss v. Rochester City Sch. Dist.,* 196 F.Supp.2d 314 (W.D.N.Y.2002) (finding that to make out a pattern and practice case, a plaintiff alleging discrimination must show systematic disparate treatment, that is, that intentional discrimination is the standard operating procedure of the defendant, not merely that there have been isolated, sporadic acts of disparate treatment). Indeed, the typical pattern or practice discrimination case is brought either by the government or as a class action to establish that unlawful discrimination has been a standard procedure or policy. *See Herendeen v. Michigan State Police,* 39 F.Supp.2d 899 (W.D.Mich.1999). Here, Plaintiffs present no allegations or evidence of a standard operating procedure of discrimination by Carnival; rather, they make individual claims of discrimination based on the isolated actions taken against them.

As Plaintiffs failed to establish their case by direct evidence or evidence of a pattern or practice, the last consideration is whether there is any indirect or circumstantial evidence to establish a *prima facie* case of discrimination. The traditional burden-shifting framework made applicable to Title VII claims in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), also applies to Plaintiffs' claims under § 1981 and Title II. *See Laroche v. Denny's, Inc.,* 62 F.Supp.2d 1375, 1382 (S.D.Fla.1999) ("*LaRoche II*") (public accommodation case under Title II and § 1981); *LaRoche v. Denny's Inc.,* 62 F.Supp.2d 1366, 1370 (S.D.Fla.1999)("*LaRoche I*") (same); *Brown v. American Honda Motor Co., Inc.,* 939 F.2d 946, 949 (11th Cir.1991) (§ 1981 case); *Robinson v. Power Pizza, Inc.,* 993 F.Supp. 1462, 1464–65 (M.D.Fla. 1998) (Title II case). That is, Plaintiffs must first establish their *prima facie* case of discrimination by a preponderance of the evidence. The burden then shifts to Carnival to articulate a legitimate, nondiscriminatory reason for the challenged action, which is a burden of production, not of persuasion.

Assuming Carnival does so, the burden shifts back to Plaintiffs to demonstrate that the reason proffered by Carnival is a pretext for discrimination. *See McDonnell Douglas,* 411 U.S. at 802–04, 93 S.Ct. 1817; *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Combs v. Plantation Patterns,* 106 F.3d 1519, 1538 (11th Cir.1997). In other words, Plaintiffs must show both that the reason provided is false and that the real reason is discrimination. *Hicks,* 509 U.S. at 506, 113 S.Ct. 2742. "The ultimate burden is on the Plaintiffs to prove that they were the victims of intentional discrimination." *Laroche II,* 62 F.Supp.2d at 1383. Accordingly, proof of intent to discriminate is necessary to establish a violation of § 1981 and Title II. *See General Bldg.*

*Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 390–91, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) (§ 1981 case); *LaRoche I,* 62 F.Supp.2d at 1371 n. 2.

■ In this case involving alleged public accommodation discrimination under § 1981 and Title II, Plaintiffs prove their *prima facie* case of discrimination if they show: (1) they are members of a protected class; (2) they attempted to contract for services and to afford themselves the full benefits and enjoyment of a public accommodation; (3) they were denied the right to contract for those services and, thus, were denied those benefits and enjoyments; and (4) similarly situated persons who are not members of the protected class received full benefits or enjoyment, or were treated better. *LaRoche I,* 62 F.Supp.2d at 1370 (citing *United States v. Lansdowne Swim Club,* 894 F.2d 83, 88 (3d Cir.1990)); *Laroche II,* 62 F.Supp.2d at 1382 (same citation). It is undisputed that Plaintiffs have satisfied the first three prongs of the *prima facie* test.

■ Carnival argues that Plaintiffs cannot establish a *prima facie* case because they cannot satisfy the fourth prong, *i.e.,* that similarly situated non-Iranian passengers were treated better. "Similarly situated" means similar in **all relevant respects**. *See Holifield v. Reno,* 115 F.3d 1555, 1563 (11th Cir.1997); *Gaston,* 129 F.Supp.2d at 1368. The burden is on the plaintiff alleging discrimination to show better treatment of individuals engaged in similar conduct. *Gaston,* 129 F.Supp.2d at 1368 (citing *Jones v. Gerwens,* 874 F.2d 1534, 1541 (11th Cir.1989)). Thus, Plaintiffs must identify Carnival passengers who also brought live animals on board a Carnival ship in violation of their ticket contracts and without prior permission and were **not** removed after Carnival learned of the circumstances; or who were removed from a Carnival ship on one day for bringing live animals on board, and then boarded a Carnival ship on the next day without notifying Carnival of their removal the day before, and were permitted to travel after Carnival learned of the circumstances. This is what Plaintiffs are required to show because these are the relevant aspects of Plaintiffs' conduct that Carnival was confronted with when it made the decisions in question.

Plaintiffs have identified no such "similarly situated" passengers, or "comparators." They have failed to identify any non-Iranian passengers, or any passengers at all, who were allowed to travel on Carnival ships with bees, or any other live animals. Although these passengers would not necessarily be "similarly situated," Plaintiffs have not identified any non-Iranian passengers, or any passengers, who were allowed to travel on Carnival ships after Carnival became aware that they had violated some *other* provision of their ticket contracts. Additionally, Plaintiffs have not alleged that other non-Iranian passengers, or any other passengers, were allowed to take a subsequent Carnival cruise after being removed the day before from a Carnival ship upon attempting to sail with live bees. They have also failed to allege that any passengers were allowed to take a subsequent Carnival cruise after being removed from a Carnival ship, for any reason, on a prior occasion.

There is evidence that Carnival routinely disembarks passengers or prevents them from boarding for a numbers of reasons, some of which would not be "similar." For example, over forty-nine (49) passengers were disembarked from or denied boarding on the *Victory* between January 6, 2002 through February 3, 2003. Of these, only the Afkhamis are known to be of Iranian national origin. Carnival does not keep a list of passengers who are asked not to return on future trips. These decisions are made on a case-by-case basis and are usually communicated orally.

Carnival is aware of incidents where non-Iranian passengers were asked not to return. Carnival has some anecdotal information regarding other passengers who have been barred from future cruises. Greg Platkin, who is not of Iranian national origin, was advised in writing of Carnival's decision to deny him boarding as a result of his past conduct. In 1995, the nine guests who were involved in numerous incidents of disruptive behavior aboard the *Jubilee* were turned over to Customs. One of these, Steve Won, was asked to disembark from a later voyage on the *Elation*. He and his roommate were specifically told not to return, and despite this, both passengers tried to re-board. This time they were stopped by security personnel and were turned over to immigration officers.

■ Greg Platkin, Steve Won and the Plaintiffs all engaged in inappropriate conduct on one Carnival cruise, and attempted to obtain passage on a subsequent cruise without Carnival's permission, and all were refused passage based on the prior conduct. Plaintiffs received the same treatment as non-Iranian passengers, rather than disparate treatment. On this record, Plaintiffs simply have not met their burden of showing that other non-Iranian passengers, who engaged in the same or similar behavior as the Plaintiffs, received better treatment from Carnival. Consequently, Plaintiffs have not established a *prima facie* case of national origin discrimination under Title II or § 1981.

**3. Moreover, No Material Facts Are in Dispute as to the Absence of Pretext for Discrimination With Regard to Plaintiffs' Disembarkation from Carnival Ships on January 6 and 7, 2002**

■ It is not necessary, therefore, to address the existence of pretext for dis-crimination, although the undersigned notes that no material facts are in dispute as to the absence of pretext for discrimination with regard to Plaintiffs' disembarkation from Carnival ships on January 6 and 7, 2002. Nonetheless, and briefly, Plaintiffs have failed to show that Carnival's legitimate non-discriminatory reason for its actions on both January 6, 2002 and January 7, 2002, *i.e.*, Plaintiffs' unauthorized possession of live bees onboard the *Victory*, in violation of Plaintiffs' ticket contracts, was a pretext for discrimination.

Plaintiffs have failed to refute Carnival's evidence that the decision to refuse Plaintiffs passage on future Carnival cruises was made on January 6, 2002 by Brendan Corrigan based on the bee incident. Admittedly, it is disputed whether or not anyone at Carnival told Plaintiffs on January 6 that they could not return on a future cruise. Regardless of whether the decision was communicated to the Plaintiffs or not, however, it is undisputed that Corrigan made the decision on that date. Therefore, Plaintiffs' heavy reliance on the existence of a gas canister that was labeled with Plaintiffs' name tags and was placed together with Plaintiffs' baggage on January 7, 2002, is unavailing. The situation with one or more gas canisters was indeed odd, but it does not show pretext, as Plaintiffs have failed to show that the confusion regarding the origin and ownership of the gas canisters was a reason behind Carnival's decision to disembark Plaintiffs from the *Imagination* on January 7.

Additionally, the statement allegedly made by a Carnival employee, presumably Christian Gonzalez, that "they're Iranian, but they're nice people," does not show pretext because it does not reveal discriminatory animus on the part of the speaker or the listener. This statement was pur-

portedly made while the Carnival employee was talking on his cellular phone to an unidentified person. No evidence has been presented as to any statements made by the other person engaged in this telephone conversation. Moreover, Plaintiffs have testified that the Carnival employee that made this statement was sympathetic to the Plaintiffs and was trying to help Plaintiffs stay on the ship, but he was instructed by his superiors to remove Plaintiffs from the *Victory.*

Christian Gonzalez was not the decisionmaker, Brendan Corrigan was, and yet Mr. Gonzalez's alleged remark is the only statement regarding Plaintiffs' national origin and the only fact (other than their passports being checked) that lead Plaintiffs to believe that Carnival's actions were discriminatory. Accordingly, even assuming Plaintiffs had established a *prima facie* case of discrimination, which they have not, Carnival has provided a legitimate non-discriminatory reason for its decisions to disembark Plaintiffs from Carnival's ships on January 6, 2002 and January 7, 2002. Plaintiffs have failed to establish that this justification is not entitled to credence and that discrimination is the real reason.

### B. *Defendant's Partial Motion to Dismiss*

For purposes of a motion to dismiss, the court must accept the allegations of the complaint as true. *United States v. Pemco Aeroplex, Inc.,* 195 F.3d 1234, 1236 (11th Cir.1999) (en banc). Moreover, the complaint must be viewed in the light most favorable to the plaintiff. *St. Joseph's Hosp., Inc. v. Hosp. Corp. of America,* 795 F.2d 948, 953 (11th Cir.1986). To warrant a dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, it must be "clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Blackston v. Alabama,* 30 F.3d 117, 120 (11th Cir.1994) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). Nonetheless, to survive a motion to dismiss, a plaintiff must do more than merely label his or her claims. *Blumel v. Mylander,* 919 F.Supp. 423, 425 (M.D.Fla.1996). Thus, dismissal of a complaint or a portion thereof is appropriate when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action. *Marshall County Bd. of Educ. v. Marshall County Gas Dist.,* 992 F.2d 1171, 1174 (11th Cir.1993). In deciding a motion to dismiss, a court may only examine the four corners of the complaint and not matters outside the complaint without converting the motion to dismiss to a motion for summary judgment. *Crowell v. Morgan Stanley Dean Witter Servs., Co., Inc.,* 87 F.Supp.2d 1287, 1290 (S.D.Fla.2000).

### 1. Plaintiffs Have Failed to State a Cause of Action Under § 1983[3] (Count II)

(a) *No Cognizable "State Action" Has Been Alleged*

Carnival argues that the remedies provided by § 1983 apply only to actions taken under color of state law, and that Plaintiffs have not plead in Count II that Carnival was acting under color of state law. As the Eleventh Circuit Court of Appeals stated in *Harvey v. Harvey,* 949 F.2d 1127, 1130 (11th Cir.1992), "[a] successful section 1983 action requires a

---

**3.** Carnival argues in its Partial Motion to Dismiss, that Plaintiffs have failed to plead certain requirements of a § 1983 claim in Count II, or alternatively, in the Motion for Summary Judgment, that Plaintiffs have failed to raise a genuine issue of material fact as to the absence of these requirements. This Order addresses only Carnival's Partial Motion to Dismiss this count, as the analysis is dispositive.

showing that the conduct complained of (1) was committed by a person acting under color of state law and (2) deprived the complainant of rights, privileges, or immunities secured by the Constitution or laws of the United States." (citing *Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 156–57, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978)) (emphasis added).

▬▬▬ In certain circumstances, however, where the activities of private actors are so intertwined with the activities of government actors such that the private actors' actions are "fairly attributable" to the state, those private actors, as well as the state actors, may be held liable under § 1983 for "acting under color of state law." "[S]tate action requires *both* an alleged constitutional deprivation 'caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible,' *and* that 'the party charged with the deprivation must be a person who may fairly be said to be a state actor.' " *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); *Flagg Bros.*, 436 U.S. at 156, 98 S.Ct. 1729). To show that an alleged deprivation was "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible," a plaintiff must show that the disputed action was taken "with the knowledge of and pursuant to" a state law, ordinance, or rule of conduct. *Sullivan*, 526 U.S. at 50, 119 S.Ct. 977. Plaintiffs here have not alleged that Carnival acted pursuant to a specific state law, ordinance or rule of conduct.

Assuming the plaintiff presents factual allegations that satisfy the first prong of the analysis, which Plaintiffs here have failed to do, the plaintiff must then show that "the party charged with the deprivation [is] a person who may fairly be said to be a state actor." *Sullivan*, 526 U.S. at 50, 119 S.Ct. 977; *Rendell–Baker v. Kohn*, 457 U.S. 830, 839, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). The analytical methods under which this second prong may be satisfied are: (1) the public function test, (2) the state compulsion test, and (3) the nexus/joint action test. *Nat'l Broadcasting Co., Inc. ("NBC") v. Communications Workers of Am., AFL–CIO*, 860 F.2d 1022, 1026 (11th Cir.1988).

The public function test "covers only private actors performing functions 'traditionally the exclusive prerogative of the State.' " *Id.* (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 353, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)). State action may be found under this test only where the plaintiff is alleging that the private entity violated his or her federally-protected rights while exercising "some power delegated to it by the State which is traditionally associated with sovereignty." *Rendell*, 457 U.S. at 842, 102 S.Ct. 2764 (citing *Jackson*, 419 U.S. at 353, 95 S.Ct. 449, and stating that "our holdings have made clear that the relevant question is not simply whether a private group is serving a 'public function.' We have held that the question is whether the function performed has been 'traditionally the exclusive prerogative of the State.' "). Passenger cruise ships, such as those operated by Carnival, have not traditionally been the exclusive prerogative of the state, nor do Plaintiffs allege that such operations are traditionally public functions. Thus, Plaintiffs have failed to allege that Carnival performs a "public function" under this test.

The state compulsion test "limits state action to instances in which the govern-

ment has coerced or at least significantly encouraged the action alleged to violate the Constitution." *NBC,* 860 F.2d at 1026. To sustain a § 1983 claim under the state compulsion test, a plaintiff must show that the government "exercised coercive power ... provided significant encouragement, either overt or covert, [such] that the choice must in law be deemed to be that of the state." *Rendell,* 457 U.S. at 839, 102 S.Ct. 2764. Plaintiffs do not allege in the Second Amended Complaint that Carnival was coerced or significantly encouraged by any governmental entity to deny Plaintiffs access to their vessel. Therefore, Plaintiffs have not alleged "state compulsion."

The nexus/joint action test is used to determine whether " 'the State had so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise.' " *NBC,* 860 F.2d at 1026–27 (citation omitted). "To charge a private party with state action under this [third test], the governmental body and private party must be intertwined in a 'symbiotic relationship.' " *Id.* at 1027 (quoting *Jackson,* 419 U.S. 345, 357, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)). "[A] sufficient close nexus (must exist) between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself." *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). Plaintiffs' burden is to show that the state exercises "such 'coercive power' or '[provides] such significant encouragement either overt or covert, that the choice must in law be deemed to be that of the [s]tate.' " *Fletcher v. State of Florida,* 858 F.Supp. 169, 171 (M.D.Fla.1994) (citing *Boczar v. Manatee Hosp. & Health Sys., Inc.,* 731 F.Supp. 1042, 1045 (M.D.Fla.1990) (quoting *Blum,* 457 U.S. at 1004, 102 S.Ct. 2777)). Moreover, the Supreme Court has indicated that the symbiotic relationship must in-

volve the " " 'specific conduct of which the plaintiff complains.' " " *Rayburn v. Hogue,* 241 F.3d 1341, 1348 (11th Cir.2001) (citing *Sullivan,* 526 U.S. at 51, 119 S.Ct. 977 (quoting *Blum,* 457 U.S. at 1004, 102 S.Ct. 2777)); *NBC,* 860 F.2d at 1027 (noting that the "Supreme Court has suggested that the symbiotic relationship must involve the alleged constitutional violation.").

Plaintiffs make only two references to a governmental entity. Plaintiffs allege that "[u]pon investigation by the Customs agent, it was determined said gas tanks did not belong to the Plaintiffs, but in fact, they belonged to Defendant." (Second Amended Complaint, ¶ 13). This statement does not satisfy the nexus/joint action test because it does not even suggest that Customs joined or was entwined with Carnival with respect to Carnival's decisions to disembark Plaintiffs from its ships. It does not allege the existence of a "symbiotic relationship," or any kind of relationship between Carnival and the agent. Additionally, Plaintiffs do not allege any causal connection between the actions of a Customs agent, or any other government official, and Carnival's actions in removing Plaintiffs from the *Victory* and the *Imagination* on January 6 and 7, 2002, respectively, which are the only actions challenged by the Plaintiffs.

In their § 1981 claims (Count I), Plaintiffs do allege that Carnival "engaged in and was involved in state action, because Carnival uses the Port of Miami, pursuant to contractual agreements between the Defendant and the Port of Miami." (Second Amended Complaint, ¶ 19). In other words, Plaintiffs allege that Carnival utilizes the Port of Miami, a Miami–Dade County government facility, for purposes of all embarkation and disembarkation of cruise ships leaving Miami. This allegation is not made in Count II, wherein the claims under § 1983 are asserted.

■ Nonetheless, adopting a liberal construction of the Second Amended Complaint, the Court finds that even though Plaintiffs are permitted to rely on the allegation in paragraph 19 in support of their § 1983 claims, this allegation is not sufficient to satisfy state action under the "nexus/joint action" test. Plaintiffs rely solely on the existence of a contract, and not on any other allegations regarding the nature of the relationship between Carnival and the Port of Miami. The alleged "contractual agreements" are not attached to or incorporated into the Second Amended Complaint. No inferences may be made regarding the terms and conditions of any contract that is not attached to or otherwise incorporated into the complaint, nor about any relationship that is based solely on such an unsubstantiated contract. This is because on a motion to dismiss, the Court may consider only the four corners of the complaint. *Crowell v. Morgan Stanley Dean Witter Servs., Co., Inc.,* 87 F.Supp.2d 1287, 1290 (S.D.Fla.2000). Conclusory statements in Plaintiffs' briefs in response to Carnival's dispositive motions to the effect that Carnival's business directly depends on using the Port of Miami and that the two have a "mutually beneficial relationship," also cannot be considered on a motion to dismiss as they are outside the "four corners." [4]

Thus, the purported "state action" allegations proffered by Plaintiffs in paragraph 19, accepted as true for purposes of Carnival's motion to dismiss, are that (1) Carnival uses the Port of Miami in its operations, and (2) a contractual agreement exists between the Port of Miami and Carnival. This is simply insufficient to satisfy the element of "state action" under § 1983. *See, e.g., Focus on the Family v.*

*Pinellas Suncoast Transit Auth.,* 344 F.3d 1263, 1278 (11th Cir.2003) ("the mere fact that a private actor contracts with a governmental entity does not mean that every action taken by the private actor can be attributed to the government"); *Patrick v. Floyd Med. Ctr.,* 201 F.3d 1313, 1316 (11th Cir.2000) (holding that management agreement between public hospital and private healthcare management company did not establish that the private entity could fairly be said to be a state actor where the hospital did not participate in or benefit from the challenged decision); *Willis v. Univ. Health Servs., Inc.,* 993 F.2d 837, 840–41 (11th Cir.1993) (finding that firing by private nonprofit health services corporation that operated hospital pursuant to a lease agreement with public hospital authority was not state action for purposes of employee's § 1983 action under "nexus/joint action" test); *NBC,* 860 F.2d at 1028 (holding that neither lease agreement between a union and the city, nor fact that convention center where union's national convention was held was "public facility," provided basis to find action of union in barring members of broadcasting company from convention "state action" pursuant to "nexus/joint action" test); *Fletcher,* 858 F.Supp. at 171 ("State regulation, substantial state funding, or a contractual relationship with a state government do not provide a sufficient nexus for state action.") (citing *Boczar,* 731 F.Supp. at 1045).

### (b) No Substantive Rights Support the § 1983 Claims

■ Carnival also seeks dismissal of Count II based on Plaintiffs' failure to plead a substantive right upon which Plaintiffs' § 1983 claims are based. Count

---

4. Plaintiffs would not be able to show state action under a summary judgment standard because the "contractual agreements" have never been introduced into the record; indeed, Plaintiffs have offered no documentary or testimonial evidence to establish a "symbiotic relationship" between the Port of Miami and Carnival.

II alleges that "[t]his action is brought by Plaintiffs against Defendant under and pursuant to the provisions of 42 U.S.C. § 1983, because Defendant violated **Plaintiffs' civil rights.**" (Second Amended Complaint, ¶ 24) (emphasis added). That statement, without more, is insufficient to state a cause of action under § 1983 because the statute is not itself a source of substantive rights. Section 1983 is a remedial statute that provides a civil cause of action when some elsewhere-defined substantive federal right has been violated. *See, e.g., Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 617, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979). "The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver,* 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (citing *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). Thus, in order to state a claim under § 1983, a plaintiff must allege the defendant violated a right preserved by a federal law other than § 1983. *See, e.g., Chapman,* 441 U.S. at 617, 99 S.Ct. 1905 ("**Standing alone, § 1983 clearly provides no protection for civil rights** since, as we have just concluded, § 1983 does not provide any substantive rights at all.") (emphasis added); *Baker,* 443 U.S. at 144 n. 3, 99 S.Ct. 2689 ("that section [§ 1983] is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes").

In the general allegations and in the § 1981 count (Count I), Plaintiffs allege civil rights violations that, **if proven,** may be remedied under § 1983, *i.e.,* "Plaintiffs' right to make and enforce contracts." (Second Amended Complaint, ¶ 18). Paragraph 14 states that "[t]he sole reason why

Defendant refused transportation and accommodations to Plaintiffs as requested on January 6, 2002 and January 7, 2002 as aforesaid, was on account of the Plaintiffs race, color, origin, ethnicity, and nationality, discrimination against Plaintiffs, and not for reasons applicable of all citizens alike of every race, color, origin, ethnicity, and nationality." Here, Plaintiffs apparently are referring to discriminatory conduct prescribed under Title II and § 1981. In paragraph 21, Plaintiffs state that "Section 1981 protects all people from racial discrimination during the making of contracts." In Count II, the § 1983 claims, Plaintiffs simply allege that Carnival "violated Plaintiffs' civil rights." A liberal construction of Plaintiffs' claims leads to the conclusion that the § 1983 claims are grounded upon the same civil rights violations as the § 1981 and Title II claims, *i.e.,* public accommodation discrimination on the basis of national origin.

Because this Order grants summary judgment in favor of Carnival on Counts I and III of the Second Amended Complaint, Count II is dismissed as it is based upon the identical violations addressed in Counts I and III. Nowhere in the Second Amended Complaint do Plaintiffs allege any other independent substantive rights or federal laws upon which their § 1983 claims are based.

(c) *Plaintiffs Have Not Alleged an Official Government Policy or Unofficial Custom, Practice or Decision of a Final Policymaker*

Plaintiffs have also failed to allege a government policy or custom that caused a violation of Plaintiffs' rights under § 1983. It is only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the govern-

ment as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *see also Patrick*, 201 F.3d at 1313. Thus, a plaintiff must identify an officially promulgated "policy," or an unofficial "custom" or practice shown through the decisions of a final policymaker, that caused the plaintiff's (constitutional or federal statutory) injury. *Monell*, 436 U.S. at 690–691, 98 S.Ct. 2018; *Grech v. Clayton County, Georgia*, 335 F.3d 1326, 1329–30 (11th Cir.2003); *City of Canton v. Harris*, 489 U.S. 378, 379, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (the government's custom or practice must be "the 'moving force [behind] the constitutional violation.'") (citations omitted). In the present case, Plaintiffs have failed to allege that Carnival violated their rights pursuant to a government policy, custom, practice, or decision by a final policymaker. Plaintiffs argue that their allegations that employees of Carnival were involved in the expulsion of the Plaintiffs from the ships satisfies this test, but, as previously discussed, Plaintiffs have failed to establish that Carnival and its employees may be considered state actors. Plaintiffs do not contend that Carnival acted pursuant to an **official** policy, custom, practice or decision of the federal, state or municipal (Miami–Dade County) governments.

#### (d) *Requirements for a Third Amended Complaint*

Plaintiffs are permitted to file a one-count Third Amended Complaint seeking redress only under § 1983. Should Plaintiffs choose to file such a Third Amended Complaint, they must in good faith be able to allege the following to cure the deficiencies of the existing Count II:(1) that a

"symbiotic relationship," as described above, existed between Carnival and a governmental actor *specifically with respect to* Carnival's decision to remove Plaintiffs from its ships on January 6, 2002 and January 7, 2002; (2) that Plaintiffs' removal from Carnival's ships violated a specific substantive right or rights of the Plaintiffs arising under the United States Constitution or federal laws, other than § 1983 itself and other than Title II and § 1981; and (3) that Carnival acted pursuant to a governmental policy, custom, or a final decision of a policymaker.

### IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** as follows:

1. Carnival's Partial Motion to Dismiss and Partial Motion to Strike Plaintiffs' Second Amended Complaint (D.E. 38) is **GRANTED** in part. Count II of the Second Amended Complaint is **DISMISSED** without prejudice. Plaintiffs may file a one-count Third Amended Complaint containing amended § 1983 claims within **five (5) calendar days** from the date of this Order. The Third Amended Complaint shall comply with the pleading requirements set forth above. **Plaintiffs shall hand-deliver or fax a copy of a Third Amended Complaint to chambers and to opposing counsel on the date of filing.** Carnival shall file an answer[5] to any Third Amended Complaint within **five (5) calendar days** from receipt. **Carnival shall hand-deliver or fax a copy of its Answer to chambers and to opposing counsel. If no Third Amended**

---

5. The deadline for filing pre-trial dispositive motions has passed. However, any Rule 12(b)(6) defenses to a Third Amended Com-

plaint may be raised in Carnival's Answer, or at the trial on the merits pursuant to Rule 12(h), Fed. R. Civ. P.

Complaint is filed within the time specified, Count II shall be DIS-MISSED without prejudice and the case shall be CLOSED.

2. Carnival's Motion for Summary Judgment (D.E. 89) is **GRANTED** in part. Summary Partial Final Judgment will be **ENTERED** in favor of the Defendant and against Plaintiffs on Counts I and III of the Second Amended Complaint by separate order as required by Rule 58, Fed R. Civ. P.[6] Carnival's Motion for Summary Judgment as to Count II is **DENIED** as moot.

3. Plaintiffs' Motion for Continuance of Trial (D.E. 100) is **DENIED**. *The parties shall appear at the Calendar Call scheduled for February 3, 2004.*

**6.** Carnival has also moved to strike Plaintiffs' requests for money damages and for a jury with respect to the Title II claim. These issues have been rendered moot by the summary judgment on Count III.