**Felicia BROOKS, Jean Denny, and Stephanie Densey, Plaintiffs,**

v.

**COLLIS FOODS, INC., and Waffle House, Inc., Defendants.**

**No. 2:03–CV–0155–RWS.**

United States District Court, N.D. Georgia, Gainesville Division.

March 31, 2005.

David C. Ates, Alysa Beth–Ann Freeman, Michael P. Elkon, Atlanta, GA, Gerald L. Maatman, Jr., PHV, Sari M. Alamuddin, PHV, Chicago, IL, for Plaintiffs.

Richard Gerakitis, Frederick Cobb Dawkins, Rebecca Lyn Williams, Atlanta, GA, Frederick E. Link, Gainesville, GA, for Defendants.

## ORDER

STORY, District Judge.

Now before the Court for consideration are Defendant Waffle House, Inc.'s Motion to Strike Plaintiff's Supplement to their Initial Disclosures [73–1], Defendant Waffle House, Inc.'s Motion for Summary Judgment [79–1], Defendant Collis Foods, Inc.'s Motion for Summary Judgment [91–1], Plaintiffs' Motion for Leave to file Excess Pages [100–1], Consent Motion for Extension of Page Limitation [119–1], Defendant Collis Foods, Inc.'s Motion for Protective Order Regarding Confidentiality Designation [123–1], Plaintiffs' Motion for Leave to File a Surreply to Defendant Waffle House's Reply Brief [124–1], Plaintiffs' Motion to Extension of Time [128–1]. After considering the entire record and the arguments of the parties, the Court enters the following Order.

### Background

This case arises out of Plaintiffs' allegations of race discrimination at a Waffle House restaurant in the North Georgia mountains. The Waffle House restaurant system consists of over 1,400 corporate-owned and franchise-owned restaurants throughout the United States. Defendant Collis Foods, Inc. ("Collis Foods") is a Waffle House franchisee that owns and operates 72 restaurants in Georgia, Tennessee, Mississippi, and Arkansas including the Waffle House restaurant located in Blue Ridge, Georgia (hereinafter "Blue Ridge Waffle House"). The primary facts of the case are largely undisputed. Where there are conflicting facts, the Court has construed the facts in favor of Plaintiffs.

Plaintiffs Felecia Brooks, Jean Denny and Stephanie Densey, African–American women, drove from the Atlanta area to Blue Ridge, Georgia for a weekend trip. Plaintiffs and another friend, Jackie Kameri, arrived in Blue Ridge on a Friday evening. The next day, Saturday, October 26, 2002, Plaintiffs left their cabin around 10:00 a.m. Ms. Kameri remained at the cabin. Plaintiffs made a reservation to go white water rafting, stopped at an ATM and then went to the Blue Ridge Waffle House, which they had passed on their way to their cabin the night before. Although Plaintiffs had previously dined at

other Waffle House restaurants, Plaintiffs had never been to the Blue Ridge Waffle House. When Plaintiffs arrived at around 11:00 a.m. they noticed that the parking lot was full. Upon entering the restaurant they realized that there was not an empty seat in the entire restaurant and they were going to have to wait for a table to become available. Plaintiffs were the only African–American customers at the restaurant when they arrived and no other African–American customers entered the restaurant while they were there. There were no African–American employees working at the Blue Ridge Waffle House.

Plaintiffs were not greeted when they entered the restaurant even though white customers who subsequently entered the restaurant were greeted as they entered. Ms. Densey spoke to the hostess and requested to sit at a booth and stated that Plaintiffs preferred not to sit near people who were smoking. After Plaintiffs had been waiting for around ten minutes, three seats at the lower counter became available. The hostess asked Plaintiffs if they would like to take the counter seats but Plaintiffs stated that they would rather wait for a booth. The hostess indicated to Plaintiffs that they could have a seat at the counter and then move to booth when one became available.[1] Plaintiffs were seated next to a customer who was smoking.

When Plaintiffs sat down, there was no silverware or water glasses on the counter. Plaintiffs waited there for fifteen to twenty minutes. During this time, several booths became available but none of them were offered to Plaintiffs. Instead, white customers who had entered after Plaintiffs were seated in the booths. Toward the end of this time period, a booth directly behind Plaintiffs became available. At this point, no waitress had approached Plaintiffs to greet them, to offer them drinks or silverware or to take their orders. Ms. Densey approached the hostess and requested that they be moved to the available booth. She also requested service. When the hostess approached the waitress who was clearing the table, the waitress stated that she was clearing the table for someone else. White customers were seated in the booth. Subsequently, a waitress began to approach Plaintiffs, but then gestured to another waitress, shook her head and indicated that she did not want to wait on Plaintiffs. Plaintiffs did not hear what she said, but they overhead the second waitress say, "Ok you help them over there and I'll take these guys right here."

Waitress Mary Renee Allen then came to take Plaintiffs' drink orders. Ms. Allen acted as if it were an inconvenience to wait on Plaintiffs. Plaintiffs ordered orange juice, and Ms. Allen returned with the drinks about ten minutes later. Ms. Allen appeared to slam the juice down on the counter and shove it toward Ms. Brooks. Plaintiffs observed that Ms. Allen deliberately spilled the juice some of which ended up on Ms. Brooks' lap. Ms. Allen did not apologize, but wiped the juice up with a dirty dish cloth, mostly smearing the juice around the counter. Plaintiffs cleaned up the remaining juice with napkins. Ms. Allen brought Ms. Brooks another drink and threw straws that Ms. Densey had requested on the counter. At this point, Plaintiffs considered leaving the restaurant, but decided to stay because Ms. Denny feared that she would get a migraine if she did not have breakfast.[2]

About five to ten minutes after the juice was spilled, another waitress came to take Plaintiffs' food order. The waitresses's demeanor was cold and condescending.

---

**1.** Defendants contend that Plaintiffs agreed to sit and be served at the counter.

**2.** Ms. Denny states that she has gastroenteritis and gets migraine headaches if she does not eat on schedule.

Plaintiffs waited another thirty to forty five minutes for their food to arrive. During this time, white customers who came in after Plaintiffs had finished their meals and were leaving the restaurant. Plaintiffs received their food about one hour and ten minutes after entering the restaurant. Ms. Brooks' food was burned and cold. The only portion of her meal she ate was the toast. Ms. Densey's order was incorrect, she ordered the Texas Steak melt without mushrooms but received a patty melt with mushrooms. Ms. Densey only ate part of a pecan waffle she shared with Ms. Denny. Ms. Denny's food was also cold, but she ate most of her omelet, half of a pecan waffle and possibly part of a biscuit.

As the waitress served Plaintiffs their food, she and the other waitresses began to sing. It is undisputed that they sang "Swing Low Sweet Chariot" and "When the Saints Go Marching In." Defendants assert that the employees of the Blue Ridge Waffle House sometimes sang when they were busy to lighten up the atmosphere and relieve stress. Plaintiffs state that as the Waffle House employees sang, the waitresses stared at Plaintiffs as did customers who joined in the singing. Plaintiffs looked for a manager to complain but noticed that all employees were singing. Plaintiffs concluded that they could not complain because the manager either condoned or participated in the conduct. Plaintiffs paid their bill, tipped their waitress and left the restaurant. Ms. Brooks requested a receipt but the cashier refused to give her one. Plaintiffs were in the restaurant for a total of about one hour and fifteen minutes. While they were in the Blue Ridge Waffle House, Plaintiffs did not hear anyone in the restaurant use racial slurs, make racial jokes, or direct any expletives at them.

On Monday, October 28, 2002, Ms. Brooks called Defendant Waffle House to complain about race discrimination. She obtained the number by calling 411. The Waffle House representative referred her to Jeff Allen at Collis Foods. Waffle House did not conduct any investigation or take any action after referring Ms. Brooks to Collis Foods.

Ms. Brooks called Mr. Allen to lodge a complaint. Ms. Brooks described what had happened to Plaintiffs while at the Blue Ridge Waffle House. Mr. Allen told her that he would conduct an investigation and get back to her. Ms. Denny also spoke with Mr. Allen. Mr. Allen requested that Ms. Denny provide a written statement of what had happened. Mr. Allen directed Collis Foods Area Manager Tim Farris to conduct an internal investigation of Plaintiffs' complaint. Farris directed District Manager Kristal Lucas to interview the employees of the Blue Ridge Waffle House. Ms. Lucas was not trained in conducting race discrimination investigations. She primarily investigated by talking with Blue Ridge Waffle House employees, but did not speak to all the employees who were working that day. Mr. Allen states that he wrote to Ms. Denny to remind her to send in a written statement. Ms. Denny states that she never received any communication from Mr. Allen.

Plaintiffs filed suit against Defendants Collis Foods and Waffle House, Inc., and asserted claims alleging race discrimination in violation of 42 U.S.C. § 1981 and 42 U.S.C. § 2000a.

### Discussion

As a preliminary matter, Plaintiffs' Motion for Leave to file Excess Pages [100–1], Consent Motion for Extension of Page Limitation [119–1], Plaintiffs' Motion for Leave to File a Surreply to Defendant Waffle House's Reply Brief [124–1], and Plaintiffs' Motion to Extension of Time [128–1] are hereby **GRANTED** *nunc pro tunc.*

## I. Motion to Strike & Motion for Protective Order

The Court has carefully reviewed the parties briefs and arguments. As to Defendant Waffle House, Inc.'s Motion to Strike Plaintiff's Supplement to their Initial Disclosures, the Court finds that Plaintiffs' supplement is untimely. Moreover, pursuant to the discussion, *infra,* the Court finds that pending lawsuits against Waffle House are not relevant as to Defendant Collis Foods. Accordingly, Defendant Waffle House, Inc.'s Motion to Strike Plaintiff's Supplement to their Initial Disclosures [73–1] is hereby **GRANTED**.

As to Defendant Collis Foods, Inc.'s Motion for Protective Order Regarding Confidentiality Designation, the Court finds that Plaintiffs' objections to the confidentiality designation were untimely. Accordingly, that motion [123–1] is hereby **GRANTED**.

## II. Motion for Summary Judgment

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the non-movant. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## A. Liability of Waffle House

Defendant Waffle House moves for summary judgment and asserts that because the Blue Ridge Waffle House operated under a franchise agreement with Collis Foods, and because it was not an agent or alter ego of Waffle House, then Waffle House cannot be liable for the actions of the employees of Collis Foods. Plaintiff responds that Waffle House, through its franchise agreement, exerted day-to-day control over the Blue Ridge Waffle House. In the alternative, Plaintiff contends that Waffle House held out Collis Foods as its agent such that Collis Foods became an apparent agent of Waffle House.

### 1. Actual agency

Under Georgia law, the mere fact that a business operates under a franchise contract on a royalty basis does not create an agency or partnership relationship. *McGuire v. Radisson Hotels Int'l. Inc.,* 209 Ga.App. 740, 435 S.E.2d 51, 52 (1993). Rather, it is well settled that in order to impose liability on a franchisor for the acts of a franchisee, a plaintiff mush show either (1) that a franchisor has obligated itself to pay the debts of the franchisee, or (2) that the franchisee is not a franchisee but an agent or alter ego of the franchisor. *Pizza K. Inc. v. Santagata,* 249 Ga.App. 36, 547 S.E.2d 405, 406 (2001). To determine whether an agency relationship exists, Georgia courts look to whether the contract gives or the employer assumes the right to control the time and manner of executing the work as distinguished from the right to require results in conformity to the contract. *Id.* Because the construction of written contracts is for the court, the court may determine the agency issue as a matter of law. *McGuire,* 435 S.E.2d at 52–53.

Specifically, Georgia courts have recognized the special relationship created by a

franchise agreement. For instance, courts have recognized the need for controls over the use of a trade name. *McGuire*, 435 S.E.2d at 53. Furthermore, "a franchisor is faced with the problem of exercising sufficient control over a franchisee to protect the franchisor's national identity and professional reputation, while at the same time foregoing such a degree of control that would make it vicariously liable for the acts of the franchisee and its employees." *Id.* (quoting *McMullan v. Ga. Girl Fashions*, 180 Ga.App. 228, 348 S.E.2d 748, 750 (1986)).

Courts that have examined whether an agency relationship exists in the context of a franchisor-franchisee relationship have distinguished between a franchisor's right to inspect and monitor a franchise for compliance with its standards and day-to-day supervisory control of the franchisee's business operations. *See BP Exploration & Oil, Inc. v. Jones*, 252 Ga.App. 824, 558 S.E.2d 398, 402 (2001) (manual providing for appearance and cleanliness standards including what cleaners to use, when to mop floors, and when to turn products are merely means of permitting franchisor to maintain quality and uniformity and insufficient to establish control supporting a finding of actual agency); *Pizza K*, 547 S.E.2d at 407 (stating that franchise agreement that served as a means of ensuring a certain level of quality and maintaining professional reputation are not sufficient to create agency relationship); *Schlotzsky's, Inc. v. Hyde*, 245 Ga.App. 888, 538 S.E.2d 561, 562 (2000) (a franchisor's right to inspect a franchisee's compliance with standards is not equivalent to day-to-day supervisory control as a matter of law).

▇ Here, Waffle House has no ownership interest in any restaurant operated by Collis Foods. The Franchise Agreement for the Blue Ridge Waffle House specifically disavows an agency relationship and provides that "the relationship between them is that of independent contractors, and not partners, joint ventures or principal-agent." (Hutchens Dep. Ex. 1 ¶ 27 (hereinafter "Franchise Agreement").) Notwithstanding this language, Plaintiffs point to numerous provisions of the Franchise Agreement that provide for the design and layout of the Blue Ridge Waffle House, its appearance and operation, days and hours of operation, advertising, royalties, annual reports, staffing ratios and provided for quarterly inspections for conformity with these requirements. Moreover, Plaintiffs contend that Waffle House promulgated and required adherence to the customer service policies that Defendants violated in this case.

Plaintiffs have failed to create a genuine issue of material fact regarding an actual agency relationship between Collis Foods and Waffle House. While it is evident that the Franchise Agreement provided numerous quality control requirements to ensure the conformity of Waffle House restaurants, including the Blue Ridge Waffle House, there is no evidence that Waffle House exerted any control over the day-to-day operations of the Blue Ridge Waffle House. *Schlotzsky's*, 538 S.E.2d at 562 (very detailed standards pertaining to food preparation, hygiene and sanitation did not show that franchisor retained the right to control the time, manner, or method in which the franchisee through its employees actually executed those standards). Furthermore, Waffle House did not retain supervisory control over the hiring or firing of Blue Ridge Waffle House employees. *See Frey v. PepsiCo, Inc.*, 191 Ga. App. 585, 382 S.E.2d 648, 650 (1989) (control over franchisee's manufacturing and packaging operations did not suggest that franchisor retained control over route salesmen). Finally, Plaintiff points out that the Blue Ridge Waffle House directed customers to "Let Us Know" about comments and complaints and listed the con-

tact information for Waffle House's offices in Norcross, Georgia. However, this is not significant here because when Plaintiff Brooks contacted the Waffle House office in Norcross regarding her complaint, she was immediately referred to Jeff Allen of Collis Foods. As a matter of law, Plaintiff cannot show that an actual agency relationship existed between Waffle House and Collis Foods.

### 2. Apparent agency

■■ Plaintiffs also assert that Waffle House is liable for the acts that took place at the Blue Ridge Waffle House based on a theory of apparent agency. In order to recover under a theory of apparent agency, a plaintiff must show that (1) the apparent principal represented or held out the apparent agent; and (2) justifiable reliance upon the representation led to the injury. McGuire, 435 S.E.2d at 53. Therefore, Plaintiffs must show that Waffle House held out Collis Foods as its agent and that Plaintiffs justifiably relied on that representation and were injured. It is not enough that the plaintiff believe that there was an agency relationship, rather an objective standard applies. Id.

In McGuire, the plaintiff went to a Radisson lounge operated by a franchisee. The plaintiff contended that the only reason he went there was because he believed that the lounge was owned and operated by Radisson and that the quality of the environment would be that suggested by Radisson's advertising. Id. at 54. The Georgia Court of Appeals rejected the plaintiff's argument, reasoning that the theory of apparent agency focuses on the actions of the principal and not the actions of the agent. Id. In that case, the plaintiff was relying on the franchisee's signage, bearing the Radisson name, therefore he was relying on representations made by the agent. Since the plaintiff could not point to any evidence that the principal

had made any representations regarding the agent, the plaintiff's claim failed.

■ This case presents precisely the same situation. Plaintiffs argue that they believed they were entering a Waffle House restaurant that was owned and operated by Waffle House. This belief, however, was a result of the actions of Collis Foods bearing the Waffle House logo, signage, etc. Collis Foods is holding itself out as a Waffle House, not the reverse. There is simply no evidence that Waffle House made any representations at all regarding Collis Foods or the Blue Ridge Waffle House, much less that it held out Collis Foods as its agent. Accordingly, Defendant Waffle House, Inc.'s Motion for Summary Judgment is hereby **GRANTED**.

### B. 42 U.S.C. § 2000a

Plaintiffs have asserted claims under Title II of the Civil Rights Act of 1964, which provides that "[a]ll persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a. Defendant does not dispute that it is a place of public accommodation.

■ In a suit under Title II, a plaintiff may not recover damages, but is entitled only to injunctive relief. Newman v. Piggie Park Enters., Inc., 390 U.S. 400, 401–02, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968); Jackson v. Motel 6 Multipurpose, Inc., 130 F.3d 999, 1007 (11th Cir.1997). In order to claim injunctive relief, a plaintiff must show "real or immediate threat that the plaintiff will be wronged again—'a likelihood of substantial and immediate irreparable injury.'" Jackson, 130 F.3d at 1007 (quoting City of Los Angeles v.

*Lyons,* 461 U.S. 95, 111, 103 S.Ct. 1660, 1670, 75 L.Ed.2d 675 (1983)).

■ Here, Defendant contends that there is no "real and immediate" threat to Plaintiffs or other African–Americans that they will be deprived of access to the Blue Ridge Waffle House in the future. Plaintiff Brooks argues that she is at continuing risk of future harm because she continues to frequent other Waffle House restaurants. Plaintiff Denny contends that she would return to Waffle House restaurants if she could be assured that she would not be subject to discrimination.

The Court finds that Plaintiffs have not made a showing that they are subject to an immediate threat of irreparable harm. Plaintiffs have made no showing that Plaintiffs are subject to any future harm at all, other than their speculation that they will be subject to discrimination at the Blue Ridge Waffle House or another Waffle House restaurant. *See Lyons,* 461 U.S. at 111, 103 S.Ct. 1660 (stating that the speculative nature of the plaintiff's claim of future injury shows that equitable relief is not warranted). Moreover, Plaintiffs do not contend that Collis Foods maintains discriminatory policy and procedure. To the contrary, they acknowledge that Defendant has in place anti-discrimination policies. Defendant is entitled to judgment as a matter of law on Plaintiffs' Title II claims.

### C. 42 U.S.C. § 1981

Section 1981 prohibits discrimination on the basis of race in the making and enforcement of private contracts. It provides that

[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981. In response to the Supreme Court's holding in *Patterson v. Mc-Lean Credit Union,* 491 U.S. 164, 177, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), that the protection of § 1981 does not extend to conduct after the contractual relationship has been established, Congress amended § 1981 to expand its reach. *See Andrews v. Lakeshore Rehab. Hosp.,* 140 F.3d 1405, 1411 (11th Cir.1998); *Callwood v. Dave & Buster's, Inc.,* 98 F.Supp.2d 694, 703 (D.Md.2000); *Doe v. Bd. of County Comm'rs,* 783 F.Supp. 1379, 1383 n. 11 (S.D.Fla.1992). The Civil Rights Act of 1991, Pub.L. No. 102–166, § 101 (codified as 42 U.S.C. § 1981(b)), provides that "the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

■ In order for a plaintiff to recover under § 1981, she must demonstrate that she is a member of a racial minority and that she suffered intentional race discrimination which affected her in the making and performance of a contract, including the enjoyment of the contract's benefits, privileges, terms and conditions. *Benton v. Cousins Props., Inc.,* 230 F.Supp.2d 1351, 1369 (N.D.Ga.2002) (J. Carnes); *Baker v. McDonald's Corp.,* 686 F.Supp. 1474, 1481 (S.D.Fla.1987); *see Gen. Bldg. Contractors Ass'n. Inc. v. Pennsylvania,* 458 U.S. 375, 391, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) (stating that § 1981 can be violated only by purposeful discrimination). A plaintiff may prove intentional discrimination through (1) direct evidence; (2) pattern and practice evidence, or (3) circumstantial evidence of

discrimination. *Afkhami v. Carnival Corp.*, 305 F.Supp.2d 1308, 1320 (S.D.Fla. 2004). Direct evidence of discrimination is evidence, which if believed, would prove the existence of a fact without inference or presumption. *Id.* To show a pattern or practice of discrimination, a plaintiff must provide evidence of impermissible discrimination that was the defendant's standard operating procedure through historical, anecdotal or statistical evidence or a combination thereof. *Id.* at 1321. Finally, a plaintiff may prove that she was intentionally discriminated against by presenting circumstantial evidence. *Id.*

In order to prove discrimination through circumstantial evidence, Courts have had little trouble concluding that the traditional burden-shifting framework applied in Title VII cases applies to claims under § 1981. *Christian v. Wal–Mart Stores, Inc.*, 252 F.3d 862, 869 (6th Cir.2001); *Brown v. Am. Honda Motor Co., Inc.*, 939 F.2d 946, 949 (11th Cir.1991); *Benton*, 230 F.Supp.2d at 1369; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the familiar *McDonnell Douglas* analysis, a plaintiff first must establish a prima facie case of discrimination. *Id.* at 802, 93 S.Ct. 1817; *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Establishing a prima facie case has the same effect as a presumption of unlawful discrimination; the defendant must then come forward with evidence of a legitimate nondiscriminatory reason for its action. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. When a defendant expresses one or more legitimate reasons for the action, the presumption of discrimination evaporates, and a plaintiff must raise a genuine issue of material fact as to whether the reasons offered by the defendant are pretextual. *Id.* at 804, 93 S.Ct. 1817.

### 1. Determining the proper prima facie case

While courts have had little difficulty determining that the *McDonnell Douglas* burden-shifting test is the appropriate one, Courts have struggled with the appropriate elements of a prima facie case to apply in the context of § 1981 claims. *Compare Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir.1996) (adopting three-part test including requirement that plaintiff show intentional discrimination); *with, Christian*, 252 F.3d at 868–69 (stating that *Morris* test conflates elements of § 1981 cause of action with elements of prima facie test and adopting different prima facie test); *see also Benton,* 230 F.Supp.2d at 1370 n. 14 (essentially adopting three-part *Christian* test except for subsection 3(b)). This case is no exception.

Here, Defendant argues that the Court should apply the prima facie test set forth in *Benton v. Cousins Properties, Inc.*, 230 F.Supp.2d 1351 (N.D.Ga.2002). In that case, the court stated that a prima facie case under § 1981 requires showing that: (1) plaintiff is a member of a protected class; (2) the allegedly discriminatory conduct concerned one or more of the activities enumerated in the statute, i.e., the making performance, modification, or termination of contracts or the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship; and, (3) that defendants treated plaintiff less favorably than other similarly situated individuals who were outside of plaintiff's class. *Id.* at 1370. Defendant asserts that Plaintiffs were seated, had their orders taken, received their food, paid for their food, tipped their server and left. Therefore, Defendant argues that Plaintiffs have no claim because they were not denied admittance or service at the Blue Ridge Waffle House. *See Morris*, 89 F.3d at 414 (stating that where plaintiffs were not denied admittance or service they were not

deprived of any of the enumerated rights in § 1981). Defendant contends that Plaintiffs' claims amount to nothing more than a claim for slow and poor service. *See Robertson v. Burger King,* 848 F.Supp. 78, 81 (E.D.La.1994) (stating that while frustrating and all too common, mere fact of slow service does not rise to the level of a civil rights violation).

Plaintiffs respond that they are not required to show that they were denied admittance to the restaurant or that they were refused service altogether in order to recover for a violation of § 1981. *See Charity v. Denny's, Inc.,* No. CIV A 98–0554, 1999 WL 544687, *5 (E.D.La. July 26, 1999) (concluding that being admitted into a restaurant and ultimately being served do not preclude bringing a § 1981 claim). Plaintiffs contend that they received inferior service compared to similarly situated white customers. Moreover, Plaintiffs argue that the Court should recognize their ability to state a prima facie case based on their allegations that they were treated in a markedly hostile and objectively discriminatory manner. *See Christian,* 252 F.3d at 871 (setting forth test that allows a plaintiff to establish a prima facie case by reference to similarly situated individuals or by showing they were treated in a markedly hostile manner that a reasonable person would find is objectively unreasonable).

Before analyzing Plaintiffs' claims, the Court must determine the proper framework within which Plaintiffs' claims should be reviewed. Having examined the applicable caselaw and reviewed the arguments of the parties, the Court finds that the proper prima facie test to be applied here is the test adopted by the Sixth Circuit and enunciated in *Christian v. Wal–Mart Stores, Inc.,* 252 F.3d 862, 871 (6th Cir.2001). The *Christian* prima facie case requires showing that: (1) plaintiff is a member of a protected class; (2)

plaintiff made herself available to receive and pay for services ordinarily provided by defendant to members of the public; (3) she did not enjoy the privileges and benefits of the contracted for experience under factual circumstances which rationally support an inference of unlawful discrimination in that (a) she was deprived of services while similarly situated individuals outside her class were not, or (b) she received services in a markedly hostile manner and in a manner which a reasonable person would find objectively unreasonable. *Id.* at 871. Factors relevant to determine whether a plaintiff was treated in a markedly hostile manner are whether the conduct is: (1) so profoundly contrary to the manifest financial interests of the merchant and/ or her employees; (2) so far outside widely-accepted business norms; and (3) so arbitrary on its face, that the conduct supports a rational inference of discrimination. *Id.*

In *Christian,* two friends, a black woman and a white woman, were Christmas shopping at a Wal–Mart store. *Id.* at 864. The black woman was repeatedly offered assistance while the white woman was not. Eventually the black woman was accused of shoplifting. Store associates called the police and the two women were escorted from the store without completing their purchases. *Id.* At the end of the plaintiffs' case, the district court granted judgment as a matter of law to Wal–Mart based on the plaintiffs' failure to prove the defendant's intent to discriminate. *Id.* at 867. The Sixth Circuit reversed and remanded concluding that the district court was wrong to omit the traditional burden-shifting framework in granting judgment as a matter of law.

The court explained that while a plaintiff must prove intentional discrimination to prevail under § 1981, she need not do so as an element of her prima facie case. *Id.* at 870. The very purpose of a prima facie

case is to allow a plaintiff to create a "legally mandatory, rebuttable presumption" of discrimination with only circumstantial evidence. *Id.* (quoting *Texas Dep't of Cmty Affairs v. Burdine,* 450 U.S. 248, 254 n. 7, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). The court found "it curious that so few courts have paused to remark upon the incongruity of dispensing with a prima facie test, or requiring a plaintiff to prove intentional discrimination as an element of a prima facie case in the commercial establishment context." *Christian,* 252 F.3d at 870; *see also Callwood,* 98 F.Supp.2d at 705 (stating that the Seventh Circuit's analysis in *Morris v. Office Max,* 89 F.3d 411 (7th Cir.1996), never mentions the term "prima facie case," but rather appears to be discussing the elements of the §. 1981 claim).

The *Christian* court then took the opportunity to "fashion from a clean slate an appropriate prima facie test in the commercial establishment context." *Id.* at 869. The court began by examining a decision from the District of Maryland, *Callwood v. Dave & Busters, Inc.,* 98 F.Supp.2d 694 (D.Md.2000). The court described how the *McDonnell Douglas* prima facie case arose in the context of employment discrimination. *Id.* at 870. For instance, the court noted that requiring similarly situated comparators in the employment context was appropriate because of the regularized nature of employment decisions made by supervisory personnel for which records are usually kept. By contrast, in a commercial or retail establishment, such as a retail store or restaurant, the court observed that the clientele is largely itinerant. *Id.* at 871; *see Callwood,* 98 F.Supp.2d at 706 (acknowledging that in the restaurant context interactions of a highly mobile public with hostesses, waitpersons and managers are ad hoc, transient, almost never with higher-ranking personnel of the enterprise, and are almost never documented in any meaningful sense).

> Given the ephemeral nature of interpersonal interactions in the public accommodations context, therefore, it may be wholly unrealistic to require a member of the protected class who suffers through what she perceives to be a shockingly discourteous and hostile experience, to identify victims of such outlandishly horrendous service who are not members of the protected class before the federally-guaranteed rights embodied in section 1981 may be vindicated.

*Callwood,* 98 F.Supp.2d at 706.

The Court acknowledges that the Eleventh Circuit has yet to adopt this version of a prima facie test. It is significant, however, that this test has never been rejected or even considered in a factually similar context in this Circuit.[3] In *Benton,* 230 F.Supp.2d 1351, this Court declined to fully adopt the *Christian* prima facie test in the context of a business conflict.[4] In

---

3. Defendant cites a decision of this Court, *Rachel v. Waffle House,* Civil Action No. 1:99–CV–0519–JOF (July 19, 2000) (J. Forrester). That decision is not only factually distinguishable from this case but was also decided before the Sixth Circuit adopted the prima facie test in *Christian.* Even though it was decided subsequent to the decision in *Callwood,* where the District of Maryland first enunciated the test, the *Rachel* decision does not address the *Callwood* decision.

4. Notably, the *Benton* Court adopted the *Christian* prima facie test except for 3(b), which permits a plaintiff to show discrimination by means other than similarly situated individuals by showing that she was treated in a "markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory." *Benton,* 230 F.Supp.2d at 1370 n. 14. While the court concluded that this portion of the test was legally incorrect and "unhelpful," it did so in

that case, the plaintiff was the operator of a shoe shine stand who entered into a written contract with the defendant to rent a conference room in the defendant's building. This Court had little trouble concluding that the plaintiff was not denied the benefits of her contract because, in repeated negotiations with the defendant, she could have renegotiated the contract price to secure additional benefits but did not. *Id.* at 1373. Therefore, it was the plaintiff's failure to renegotiate her contract rather than racial discrimination that explained the denial of certain incidentals to her written contract. *Id.* Finally, in addressing the plaintiff's claims that defendants were exceedingly rude to her, the court rejected any contention that rudeness alone could constitute a § 1981 claim and noted that this was particularly the case in commercial business dealings such as the plaintiff's case. *Id.* at 1376. The Court rejected the portion of the *Christian* prima facie test that permitted a showing of a "markedly hostile manner" and noted that "[w]hile there may be a certain level of courtesy expected for retail sales clerks ... there is no such norm for evaluating the civility expected of parties to a contract who are in the full throes of a business dispute." *Id.* at 1378.

Unlike *Benton*, this case arises in a factual context particularly suitable to the application of the entire *Christian* prima facie test. Here, Plaintiffs' complaints arise out of their one time visit to a restaurant where Plaintiffs could have reasonably expected a certain degree of retail customer service. *See Benton*, 230 F.Supp.2d at 1376 (acknowledging that a certain level of courtesy may be expected in retail setting but stating that "[t]he world of commercial business dealings can be a Darwinian, 'every man for himself' milieu"). The Court concludes that the test, as set forth in *Christian*, most prop-

erly accounts for the factual context when a plaintiff asserts a § 1981 claim in a restaurant setting. By allowing a plaintiff to state a prima facie case by reference to a markedly hostile environment in addition to reference to similarly situated individuals, this test accounts for the transient nature of interactions in restaurants. *See Christian*, 252 F.3d at 873 (noting that the test allows a plaintiff to state a claim when similarly situated individuals are not available); *Callwood*, 98 F.Supp.2d at 706.

In adopting a test that permits a plaintiff to make a prima facie showing by reference to either similarly situated individuals or a markedly hostile treatment, the Court does not suggest that merely receiving poor customer service will rise to the level of a civil rights violation. *Callwood*, 98 F.Supp.2d at 706 (stating that the trivialities and frustrations of life must not be made the fodder for federal civil rights claims simply because service was lacking); *see Bobbitt v. Rage, Inc.*, 19 F.Supp.2d 512, 519 (W.D.N.C.1998) (stating that, while poor service is regrettable and frustrating, it is a phenomenon familiar to all who eat at restaurants); *Robertson v. Burger King*, 848 F.Supp. 78, 81 (E.D.La.1994) (stating that while frustrating and all too common, mere fact of slow service does not rise to the level of a civil rights violation).

 While a plaintiff may not state a civil rights violation for every indignity suffered in the course of daily life, a restaurant and its employees may not evade liability under § 1981 because the defendant has devised creative means to harass and intimidate customers. "Discrimination is often simply masked in subtle forms and it is always easier to assume a less odious intention to what is in reality discriminatory behavior." *Laroche v. Den-*

the context of analyzing the particular claims in that case. *Id.*

*ny's Inc.,* 62 F.Supp.2d 1375, 1384 (S.D.Fla.1999). To adopt a test that requires a plaintiff to come forward with similarly situated individuals would fail to acknowledge that a defendant could subject a plaintiff to treatment so hostile and intimidating that the plaintiff should be permitted the inference of discrimination that a prima facie case creates. *See Benton,* 230 F.Supp.2d at 1376 ("the Court does not disagree that if "harassing" conduct becomes so extreme as to prevent a plaintiff from enjoying the benefits of her contract, it could conceivably be actionable under Section 1981"); *Bobbitt,* 19 F.Supp.2d at 518 ("there may be some level of bad service that would suffice to satisfy the third prong of the section 1981 prima facie case notwithstanding the successful completion of a sales contract"). Accordingly, this Court declines to adopt a test that would permit a defendant to escape liability based on a showing that a plaintiff received a meal, regardless of the harassment the plaintiff was subject to, the hostility of the environment or the manner in which the meal was provided. To adopt such a test would undermine the purpose of § 1981 and its amendment which provides for the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship. 42 U.S.C. § 1981.

### 2. Plaintiffs' claims in this case

Having determined the appropriate prima facie case, the Court turns to analyze Plaintiffs' § 1981 claims in this case.[5] Plaintiffs have easily established the first two elements of the prima facie case. As African–American women, they are members of a protected class. They made themselves available at the Blue Ridge Waffle House for services ordinarily provided by Defendant to all members of the public in the manner in which they are ordinarily provided. Therefore, Plaintiffs' ability to establish a prima facie case will turn on whether they can demonstrate that they did not enjoy the privileges and benefits of the contracted for experience under factual circumstances which rationally support an inference of unlawful discrimination in that (a) they were deprived of services while similarly situated persons outside the protected class were not deprived of those services, and/or (b) they received services in a markedly hostile manner and in a manner in which a reasonable person would find objectively unreasonable. *Christian,* 252 F.3d at 871.

First, under subsection 3(a),the Court looks to whether Plaintiffs were denied services while similarly situated individuals were not deprived of those services under factual circumstances which rationally support an inference of discrimination. Defendant argues that since Plaintiffs were seated, had their orders taken, received their food, and paid for their food, they were not denied any services. However, the Court declines to find that the mere fact that Plaintiffs were able to enter the restaurant and receive a plate of food forecloses the possibility that they were deprived of the "privileges and benefits of the contracted for experience" because of

5. Plaintiffs do not assert that there was any direct evidence of discrimination. Moreover, if the Court were to construe Plaintiffs' vague allegations regarding multiple lawsuits against Waffle House as assertions of a pattern and practice of discrimination, the mere filing of multiple lawsuits would not establish the requisite evidence of a standard operating procedure of discrimination. *See Afkhami,* 305 F.Supp.2d at 1321. Furthermore, there are no remaining claims against Defendant Waffle House, and therefore it does not appear that any pending lawsuits against Waffle House would be relevant to the remaining claims against Collis Foods. Consequently, the Court evaluates the viability of Plaintiffs' claims based on the prima facie test designed to test the sustainability of such claims when only circumstantial evidence is offered in support of a plaintiff's cause of action.

their race. *See Callwood*, 98 F.Supp.2d 694 ("latent and patent bigotry have not become such strangers in the public and private spheres of activity in our culture so as to justify a court's erection of impenetrable barriers"); *Charity*, 1999 WL 544687, at *5 ("in light of the clear illegality of outright refusal to serve, a restaurant which wishes to discourage minority customers must resort to more subtle efforts to dissuade"). Section 1981 provides protection to a plaintiff in not only the making and enforcement of contracts, but also the enjoyment of all "benefits, privileges, terms and conditions of the contractual relationship." 42 U.S.C. § 1981. In contrast to *Benton*, where the plaintiff had no right to extra benefits excluded from her written contract because she did not want to pay for them, 230 F.Supp.2d at 1376, an individual in a restaurant setting may be entitled to expect a certain level of service as a benefit of her contract. *See McCaleb*, 28 F.Supp.2d 1043, 1048 (N.D.Ill.1998) (noting that defendant's refusal to sell drinks to plaintiffs and to provide them with less than the full value of their purchase denied them the "accoutrements that are ordinarily provided with a restaurant meal").[6]

▮ Under Plaintiffs' facts, the Court must conclude that Blue Ridge Waffle House employees greeted white customers when they entered the restaurant but did not greet Plaintiffs, the only African–Americans in the restaurant. Plaintiffs requested a booth, but were seated at a counter so that white customers could be seated in the booth. A waitress spilled orange juice on them, flung straws at them and Plaintiffs received their food after a one hour and ten minute wait, while white customers were able to receive and complete their meals during this time. Defendant argues that the white customers were not similarly situated because they could have placed different orders. Plaintiffs indicate, however, that there is no item at the Blue Ridge Waffle House that takes more than eight minutes to prepare. Based on Plaintiffs' allegations that they were the only African–Americans in the restaurant, and they consistently received poor service and were denied benefits as compared to white customers, the Court finds that Plaintiffs' have stated a prima facie case of discrimination.[7]

▮ Plaintiffs also contend that they can establish a prima facie case because they received services in a markedly hostile manner and in a manner that a reasonable person would find objectively unreasonable. Defendant asserts that even if

---

**6.** Plaintiffs argue that Defendant failed to comply with its own customer service standards with regard to them. Defendant contends that its policy is relevant only in so far as white customers were treated differently from Plaintiffs. *See Stevens v. Steak n Shake, Inc.*, 35 F.Supp.2d 882, 891 (M.D.Fla.1998) (requiring prepayment of meals in violation of company policy is not evidence of discrimination where it is required of all customers). Evidence of disparate treatment under the policy is certainly relevant. The policy may also be relevant in evaluating whether a defendants actions are contrary to the financial interests of the defendant, outside of accepted business norms and arbitrary. *Christian*, 252 F.3d at 871 (listing factors relevant to deter-

mination of whether a plaintiff was treated in a markedly hostile manner).

**7.** While the evidence does not demonstrate that Plaintiffs were identical in every respect to white customers who were dining at the Blue Ridge Waffle House, neither were Plaintiffs clearly distinguishable from them either. Specifically, Plaintiffs do not fall into the category plaintiff who is not similarly situated because they are part of a large party where allegations of preferential seating are not well-founded. *See Callwood*, 98 F.Supp.2d at 718 (seating of African–American group near kitchen while white customers were placed on balcony was not discriminatory where white customers requested a table to be prepared but African–American customers did not).

Plaintiffs were subject to harassment, it did not rise to the level sufficient to find that they were denied any services or the benefit of any contract.[8] Here, in addition to Plaintiffs' complaints about poor service compared to white customers, Plaintiffs allege that Defendants sang "When the Saints go Marching In" and "Swing Low Sweet Chariot." Defendants do not dispute the singing of these songs. *C.f. Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir.2001) (noting that there are "many circumstances where markedly hostile treatment, even in a purportedly service-oriented industry, would raise no inference of racial animus, but rather it would simply be yet another example of the decline of civility" and emphasizing that defendants had made no statements with any racial content or overtone and that there were other Asian and African–American customers in the restaurant at the time). Plaintiffs contend further that the singing was directed at them, the only African–Americans in the restaurant, and that both employees and customers alike stared at them while singing. Combined with the preferable treatment received by white customers, the singing of songs directed at Plaintiffs leads the Court to find that Plaintiffs have stated a prima facie case of markedly hostile treatment that a reasonable person would find objectively unreasonable. *See McCaleb v. Pizza Hut*, 28 F.Supp.2d 1043, 1048 (N.D.Ill.1998) (finding that preferable treatment of white customers along with derogatory references to plaintiffs' race created inference of discrimination).

Defendant argues that the songs that were sung do not contain racial undertones and therefore they cannot create an inference of discrimination. Defendant states that admissions by Ms. Densey and Ms. Brooks that they have both sung "When the Saints Go Marching In" themselves demonstrates that the song has no racial undertones. Defendant also refers to the pervasive role that Negro spirituals play in American culture and argues that Plaintiffs' subjective interpretation of the songs as having racial undertones is insufficient to create an inference of discrimination. Insofar as Defendant contends that Plaintiffs' subjective beliefs alone are insufficient to create a question of fact, the Court agrees. The Court applies an objective standard to the review of Plaintiffs' claims of hostile treatment.

Defendant's argument regarding the singing of songs has some appeal, in that the singing of songs in the category of Negro spirituals at the Blue Ridge Waffle House does not suggest the level of racial animus that would have been present had Plaintiffs been subjected to racial slurs, expletives or name-calling. *See McCaleb*, 28 F.Supp.2d at 1046 (using racial slurs to refer to plaintiffs); *Charity*, 1999 WL 544687 at *1 (same). The facts of this case do not suggest such a high level of racial animus. Furthermore, recovery under § 1981 is not limited to such circumstances. *See Callwood*, 98 F.Supp.2d at 717–18 (no evidence of racial slurs but hostile treatment found where server refused service and gave repeated and dis-

---

**8.** Under subsection 3(b) of the *Christian* prima facie test a plaintiff may create an inference of discrimination if she shows that she did not enjoy the privileges and benefits of the contracted for experience under factual circumstances which rationally support an inference of unlawful discrimination in that (b) she received services in a markedly hostile manner and in a manner which a reasonable

person would find objectively unreasonable. *Christian*, 252 F.3d at 871. Defendant's argument that the hostile treatment did not rise to the level of a denial of benefits or services under the contract could be read under the *Christian* test as an argument that they were not deprived of the "privileges and benefits of the contracted for experience."

ruptive warnings for plaintiffs where they were in compliance with restaurant seating policy as the server understood it); *Christian*, 252 F.3d at 876 (no racial epithets, but question of fact where defendant store employee watched, followed, excessively offered assistance to black customer, and called police who escorted customer out of the store). The Court declines to accept Defendant's invitation to declare these songs have no racial undertones. Were it objectively unreasonable to find that the songs have racial undertones, Plaintiffs' own subjective beliefs about the meaning of the songs would not suffice. However, the Court finds that a reasonable jury may conclude that the singing of Negro spirituals by white employees and customers, while staring at the only African–American customers in a restaurant, does contain racial animus and therefore raises an inference of discrimination.[9]

In *Sawyer v. Southwest Airlines Co.*, 243 F.Supp.2d 1257, 1271 (D.Kan.2003), the court found a question of fact existed whether a statement contained racial animus where a flight attendant stated "eenie meenie, minie, moe pick a seat we gotta go" while African–American passengers were the only passengers standing in the aisle of an airplane prior to departure. Even though the flight attendant claimed that she did not believe the saying was racist and had never heard it used in a racist way, the court held that it was for a jury to decide whether the remark was racist or simply a benign and innocent attempt at humor. *Id.* at 1271. Likewise, in this case a jury must determine whether Defendant's employees intended to intimidate and discriminate against Plaintiffs or whether their treatment was the result of

a busy Saturday and an attempt to pass the time by singing. Here, the service that Plaintiffs received as compared to white customers in combination with the singing of Negro spirituals directed at Plaintiffs establishes a prima facie case and therefore an inference of discrimination. Moreover, it is evident that disparate treatment and the singing of Negro spirituals is contrary to Defendant's financial interests, outside of accepted business norms and so arbitrary as to suggest a rational inference of discrimination. *Christian*, 252 F.3d at 871.

 After finding that Plaintiffs have stated a prima facie case the Court next turns to Defendant's legitimate non-discriminatory reasons. When a defendant expresses one or more legitimate reasons for its action, the presumption of discrimination "evaporates," and a plaintiff must raise a genuine issue of material fact as to whether the reasons offered by the defendant are pretextual to avoid summary judgment. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817. Here, Defendant asserts two such reasons. First, Defendant asserts that the Blue Ridge Waffle House was very busy on the morning of Plaintiffs' visit. Second, Defendant asserts that it is "tradition" for the employees of the Blue Ridge Waffle House to sing when the restaurant is busy.

 Plaintiffs contend that Defendant's reasons are pretext for discrimination. *See Brown v. Amer. Honda Motor Co.*, 939 F.2d 946, 946 (11th Cir.1991) (requiring plaintiff to come forward with specific evidence demonstrating that the defendant's reasons are a pretext for dis-

---

9. Defendant makes much of the fact that Plaintiffs did not complain to the employees or manager during their visit to the Blue Ridge Waffle House. Plaintiffs assert that they could not identify any individuals in the restaurant who were not participating in the

discriminatory conduct. Given that Plaintiffs immediately complained on the Monday following their visit, the fact that they did not complain during their actual visit to the restaurant is of little import.

crimination after defendant offers sufficiently probative, credible, non-discriminatory reasons for its actions). Plaintiffs do not contest Defendant's assertion that the restaurant was busy when they arrived. Plaintiffs noticed that the parking lot was full and that there was a wait inside the restaurant. Rather, Plaintiffs contend that this stated reason is insufficient to explain Defendant's actions. Plaintiffs' waitress, Mary Renee Allen did not recall why she was unable to serve Plaintiffs more quickly. (Allen Dep. at 222.) Additionally, although the restaurant was packed when they entered, Plaintiffs stated that by the time they left, one hour and fifteen minutes later, the restaurant was partially vacant. Moreover, even if the Court were inclined to find that the busy restaurant accounted for the poor service including the spilled juice and the burned food, this fact does not account for the singing of Negro spirituals. Finally, Defendant's assertion that employees traditionally sang at the restaurant does not explain their song selection on the date of Plaintiffs' visit or that it was directed at them.[10] If a plaintiff establishes a prima facie case and proffers sufficient evidence to allow a jury to disbelieve the employer's proffered reason for the action, that alone is enough to preclude summary judgment for the employer. *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207 (11th Cir. 1997). Based on the evidence before the Court, a reasonable jury may disbelieve Defendant's explanation and may conclude that Plaintiffs were subject to intentional discrimination.

The facts of this case present a close question. The Court does not suggest that in every context a plaintiff will be able to state a § 1981 prima facie case by reference to disparate treatment through comparison to similarly situated individuals outside of the protected class and/ or evidence of racial animus and hostile environment. As the Court has noted, the prima facie case should conform to the factual context. The Court simply finds that the facts of this particular case establish a prima facie case and entitle Plaintiffs to shift the burden of production to Defendant to state a legitimate non-discriminatory reason for Plaintiffs' treatment. Since the Court further finds that a jury could disbelieve Defendant's stated reasons for the conduct, Defendant is not entitled to judgment as a matter of law. Viewing the evidence in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have raised a genuine issue of material fact regarding Defendant's violation of § 1981.

### Conclusion

Plaintiffs' Motion for Leave to file Excess Pages [100–1], Consent Motion for Extension of Page Limitation [119–1], Plaintiffs' Motion for Leave to File a Surreply to Defendant Waffle House's Reply Brief [124–1], and Plaintiffs' Motion to Extension of Time [128–1] are hereby **GRANTED nunc pro tunc.**

Defendant Waffle House, Inc.'s Motion to Strike Plaintiff's Supplement to their Initial Disclosures [73–1] is hereby **GRANTED.** Defendant Collis Foods, Inc.'s Motion for Protective Order Regard-

---

**10.** Defendant contends that because singing at the Blue Ridge Waffle House was a "tradition" it could not have been directed at Plaintiffs. The mere assertion that it was "tradition" to sing does not preclude a finding of discrimination. *See Christian*, 252 F.3d at 876 (fact that plaintiff admitted that store employee could have believed she was stealing when she unzipped her purse is not dis-

positive because next logical question is whether the store employee believed she was stealing because plaintiff was a black person who had unzipped her purse). In this case, the next logical questions are whether it is "tradition" to sing Negro spirituals when African–American customers are present in the restaurant, whether it is directed at them and whether it reflects an intent to discriminate.

ing Confidentiality Designation [123–1] is hereby **GRANTED**.

Defendant Waffle House, Inc.'s Motion for Summary Judgment [79–1] is hereby **GRANTED**. Defendant Collis Foods, Inc.'s Motion for Summary Judgment [91–1] is hereby **GRANTED in part and DENIED in part**. The parties are **DIRECTED** to file a consolidated pre-trial order within thirty (30) days of the date of entry of this Order.